IRA P. ROTHKEN (CSB No. 160029)
ira@techfirm.com
JARED P. SMITH (CSB No. 130343)
jared@techfirm.com
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone:    415.924-4250
Facsimile:    415.924-2905

LAURENCE F. PULGRAM (CSB No. 115163)
lpulgram@fenwick.com
JENNIFER L. KELLY (CSB No. 193416)
jkelly@fenwick.com
LIWEN A. MAH (CSB No. 239033)
lmah@fenwick.com
ERIN SIMON (CSB No. 268929)
esimon@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

Attorneys for Plaintiff
MEGAUPLOAD LTD.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MEGAUPLOAD LTD.,<br><br>                        Plaintiff,<br><br>        v.<br><br>UNIVERSAL MUSIC GROUP, INC. and<br>DOES 1 to 100, inclusive,<br><br>                        Defendants. | Case No. CV-116216-CW<br><br>***EX PARTE* APPLICATION FOR<br>TEMPORARY RESTRAINING ORDER<br>AND ORDER TO SHOW CAUSE RE<br>PRELIMINARY INJUNCTION;<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT<br>THEREOF**<br><br>Date:    December _14 2011<br>Time:    __:__ A.M.<br>Dept:    Courtroom 2 – 4th Floor<br>Judge:   The Hon. Claudia Wilken<br><br>Action Filed:       December 12, 2011 |

# TABLE OF CONTENTS

Page

APPLICATION FOR TEMPORARY RESTRAINING ORDER ................................................. 1

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    Plaintiff's and Defendant's Businesses ...................................................................... 3

    B.    The creation of the Megaupload Video ...................................................................... 3

    C.    Plaintiff Already Has Been Seriously Harmed, and Absent an Immediate Injunction, Will Be Irreparably Injured. ................................................ 4

ARGUMENT ......................................................................................................................... 5

I.    STANDARD FOR PROVISIONAL RELIEF ................................................................ 5

II.    THE DMCA IS DESIGNED TO PROVIDE EFFECTIVE NOTICE AND TAKEDOWN PROCEDURES—AND ALSO TO RESTRAIN THEIR ABUSE. ...................................................................................................................... 6

    A.    Rights of Content Owners and Internet Service Providers under DMCA .............. 6

    B.    Prohibition of Misrepresentations ............................................................................. 7

    C.    Injunctive Relief for Misrepresentations ................................................................... 8

III.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS MISREPRESENTATION CLAIM UNDER DMCA § 512(f) AND ITS CLAIM FOR DECLARATORY RELIEF OF COPYRIGHT OWNERSHIP. .................. 8

    A.    UMG's Takedown Notices Contained Misrepresentations. ..................................... 8

    B.    UMG's Misrepresentations Were Knowing .......................................................... 11

    C.    UMG's Misrepresentations Were Material ............................................................. 14

IV.    UMG'S ACTIONS TO REMOVE CONTENT IT DOES NOT OWN HAS CAUSED, AND CONTINUES TO CAUSE, IRREPARABLE HARM TO MEGAUPLOAD. ...................................................................................................... 14

V.    THE BALANCE OF HARM SHARPLY FAVORS MEGAUPLOAD BECAUSE OF ITS NEED TO HAVE ITS OWN PROMOTIONAL VIDEO WIDELY AVAILABLE NOW, WHEN THE VIDEO IS FRESH AND POPULAR. ................................................................................................................ 17

VI.    PUBLIC INTEREST IS NOT SERVED BY FALSE TAKEDOWN NOTICES. ............................................................................................................... 18

CONCLUSION ................................................................................................................... 19

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Aalmuhammed v. Lee,
202 F.3d 1227 (9th Cir. 2000).................................................................................................. 10

Alliance for the Wild Rockies v. Cottrell,
632 F.3d 1127 (9th Cir. 2011)..................................................................................................... 5

Amaretto Ranch Breedables v. Ozimals, Inc.,
No. 10-05696-CRB, 2010 WL 5387774 (N.D. Cal. Dec. 21, 2010)........................ 7, 8, 16, 18

Amoco Prod. Co. v. Vill. of Gambell, Alaska,
480 U.S. 531 (1987)................................................................................................................... 17

Biosafe-One, Inc. v. Hawks,
524 F. Supp. 2d 452 (N.D. Cal. 2007) .......................................................................... 8, 15, 17

Bridgeport Music, Inc. v. UMG Recordings, Inc.,
585 F.3d 267 (6th Cir. 2009)..................................................................................................... 12

Burrow-Giles Lithographic v. Sarony,
111 U.S. 53 (1884)..................................................................................................................... 10

California Independent System Operator Corp. v. Reliant Energy Sers., Inc.,
181 F. Supp. 2d 1111 (E.D. Cal. 2001)....................................................................................... 5

Design Furnishings, Inc. v. Zen Path, LLC,
2010 U.S. Dist. LEXIS 135819 (E.D. Cal. Dec. 23, 2010)................................... 15, 16, 17, 18

Ground Zero Museum Workshop v. Wilson,
C.A. No. DKC 09-3288, 2011 WL 3758582 (D. Md. Aug. 24, 2011) .................................... 14

Hybritech Inc. v. Abbott Labs.,
849 F.2d 1446 (Fed.Cir.1988)................................................................................................... 18

Indep. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly,
572 F.3d 644 (9th Cir. 2009)..................................................................................................... 18

Jorgensen v. Cassiday,
320 F.3d 906 (9th Cir. 2003)..................................................................................................... 18

Lenz v. Universal Music Corp.,
572 F. Supp. 2d 1150 (N.D. Cal. 2008) ................................................................. 8, 11, 12, 19

Online Policy Group v. Diebold, Inc.,
337 F. Supp. 2d 1195 (N.D. Cal. 2004) ............................................................................ passim

Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co.,
367 F.3d 1108 (9th Cir. 2004)..................................................................................................... 8

Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,
944 F.2d 597 (9th Cir. 1991)..................................................................................................... 15

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*Scherr v. Volpe*,
    466 F.2d 1027 (1972)................................................................................................ 18

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)....................................................................................... 15

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    188 F.3d 1115 (9th Cir. 1999)....................................................................................... 7

*Super-Krete Int'l, Inc. v. Sadleir*,
    712 F. Supp. 2d 1023 (C.D. Cal. 2010)...................................................................... 15

*UMG Recordings, Inc. v. Augusto*,
    628 F.3d 1175 (9th Cir. 2011)..................................................................................... 12

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000)........................................................................... 12

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
    665 F. Supp. 2d 1099 (C.D. Cal. 2009)...................................................................... 12

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................................... 5

**STATUTES**

17 U.S.C. §107.................................................................................................................. 13

17 U.S.C. § 504................................................................................................................... 6

17 U.S.C. § 512........................................................................................................ 3, 12, 18

17 U.S.C. § 512(c)...................................................................................................... 6, 7, 11

17 U.S.C. § 512(c)(3).................................................................................................. 2, 6, 10

17 U.S.C. § 512(c)(3)(A)(ii), (v)....................................................................................... 13

17 U.S.C. § 512(f).................................................................................................... *passim*

17 U.S.C. § 512(g)............................................................................................................ 1, 7

17 U.S.C. § 512(g)(1).......................................................................................................... 6

17 U.S.C. § 512(g)(2)(C)...................................................................................................... 7

17 U.S.C. § 512(g)(4)........................................................................................................... 6

**RULES**

Civil Local Rule 65-1.......................................................................................................... 1

Fed. R. Civ. P. 65................................................................................................................. 1

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*EX PARTE* APPLICATION FOR TRO AND
OSC RE PRELIMINARY INJUNCTION

iii

Case No. CV-116216-CW

**OTHER AUTHORITIES**

Jennifer M. Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act,* 22 Santa Clara Computer & High Tech. L.J. 621, 626 n.14 & 629 (2006) ............................. 6

http://www.youtube.com/t/copyright_faq ..................................................................................... 17

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## APPLICATION FOR TEMPORARY RESTRAINING ORDER

**TO:  DEFENDANT UNIVERSAL MUSIC GROUP, INC. AND TO ITS ATTORNEYS OF RECORD:**

This application concerns a promotional video (the "Megaupload Video") that Plaintiff Megaupload Ltd. created and produced out of entirely new content in cooperation with—and with full written consent from—over eighteen celebrities. Pursuant to Fed. R. Civ. P. 65 and Civil Local Rule 65-1, Megaupload hereby moves the Court *ex parte* for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, and for issuance of such Preliminary Injunction, to enjoin Defendant Universal Music Group, Inc. ("UMG") and its officers, agents, servants, employees and attorneys, and those in active concert or participation with them from:

- attempting to bar the distribution, hosting, linking, licensing, performance, or display of the Megaupload Video, in whole or in part;

- submitting or advancing any takedown notices, or declining any request by Megaupload to withdraw any takedown notices, under the Digital Millennium Copyright Act ("DMCA") with respect to the Megaupload Video; or

- making any further misrepresentations regarding UMG's purported ownership of online content that it does not in fact own.

Megaupload so moves on the grounds that UMG has knowingly materially misrepresented Megaupload's material or activity to be infringing, when, in fact, UMG has no ownership, and represents no one with ownership, of copyrights in the Megaupload Video. Specifically, Megaupload seeks such relief in the form of the [Proposed] Order Granting Plaintiff's Ex Parte Application For Temporary Restraining Order And Order To Show Cause Re Preliminary Injunction filed with this Application.

This Application is made on the grounds that Megaupload has suffered and will continue to suffer immediate and irreparable harm from UMG's attempts to censor content that UMG does not own, unless the activities described above are enjoined. This Application is based on the Complaint [Dkt. No. 1], accompanying Memorandum of Points and Authorities, Declaration of

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   Kim Dotcom and accompanying exhibits, [Proposed] Order Granting Plaintiff's Ex Parte

2   Application For Temporary Restraining Order And Order To Show Cause Re Preliminary

3   Injunction, and such other evidence and arguments as may be presented.

4       This Application will be heard as soon as the Court's schedule permits.  Notice of this

5   Application was provided to counsel for UMG on December 13, 2011.

6   Dated:    December 14, 2011                    ROTHKEN LAW FIRM

7                                                 By:  _____ */s/ Ira P. Rothken*_____
                                                            Ira P. Rothken
8
                                                 FENWICK & WEST LLP
9

10                                                By:  _____ */s/ Laurence F. Pulgram*_____
                                                            Laurence F. Pulgram
11
                                                 Attorneys for Plaintiff
12                                                MEGAUPLOAD LTD.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## INTRODUCTION

Plaintiff Megaupload Ltd. ("Megaupload"), founded in 2005, is a leading provider of cloud storage and data transmission services. Five days ago, it launched a campaign to promote its business, in particular, how content owners like recording artists can use its services to reach consumers. The campaign included endorsements from numerous A-List celebrities and recording artists, including Sean "Diddy" Combs, will.i.am, and Kanye West. It also included a promotional video comprised of snippets of these endorsements overlaid with music called the "Mega Song," which was filmed to create the "Megaupload Video." The video was an instant viral sensation: within hours, it was a top trending topic on Twitter, and global news media were reporting on it, linking to the video through YouTube's embedded video player.

Defendant Universal Music Group, Inc. ("UMG")—a longtime vocal opponent of file sharing services and Megaupload in particular—did not like this. It responded by sabotaging the campaign through abuse of the notice and takedown procedures of the Digital Millennium Copyright Act. Just hours after the video was released, UMG began submitting false takedown notices to YouTube (and others) claiming that the video infringed *its* copyrights. But it was Megaupload, not UMG, who created the video out of completely new and original content— without any use, or even excerpts, of pre-existing works. Furthermore, before making the video, Megaupload obtained signed agreements from all the artists and other celebrities appearing in it. Those releases unequivocally state that *all* intellectual property rights in the video were owned by Megaupload. *See* Declaration of Kim Dotcom in Support of Plaintiff's Application for Temporary Restraining Order And Order To Show Cause Re Preliminary Injunction ("Decl.") ¶ 6, Exh. A.

UMG could not actually have believed it had any valid rights under the DMCA to demand removal of the video; nonetheless, it continued to send repeated takedown notices to numerous Internet sites. These actions exemplify bad faith. And yet—UMG's scheme worked: the videos were removed from YouTube immediately in response to the fraudulent takedown notices, stopping Megaupload's campaign just as it began to launch. While Megaupload submitted counter-notices immediately under Section 512(g) of the DMCA, requesting that its video be restored, the DMCA provides no immunity to the host of content unless it waits a minimum of 10

business days to restore the content. In response, UMG did not withdraw its notices. Rather, it continued to send additional notices, with no conceivable good faith basis. Thus, absent relief from the Court, Megaupload's campaign will remain censored for at least two weeks by UMG's false initial claim of copyright ownership, and UMG can continue to send more notices resulting in further takedowns in the future.

In fact, on December 12, UMG even sent notices causing takedown of news reports on *Tech News Today* that included coverage of the Megaupload Video and discussion of UMG's take down demands. Decl. ¶¶ 19-20, Exhs. J & K.These reports were undoubtedly fair use, regardless of the copyright owner. But UMG abusively squashed them anyway under the power of the DMCA.

Megaupload has already suffered substantial harm as a result of UMG's wrongful interruption of its promotional campaign. Hundreds of thousands, and likely millions, of persons who are attempting to connect to a video promoting Megaupload in a positive light are instead being diverted to screens that, as a result of UMG's notices, falsely describe the video as copyright infringement. Decl. ¶14, Exh. F. Going forward, unless UMG is restrained from sending any further takedown notices with respect to the video, it simply can continue to censor access to it, in every place where it might crop up on the Internet, by sending additional notices. UMG has no legitimate right to provide such notices, much less under the auspices of the DMCA, which requires a claimant to certify under penalty of perjury that it has a good faith belief that use of the subject material is not authorized by the copyright owner. *See* 17 U.S.C. § 512(c)(3).

As shown below, UMG has no such good faith basis for its DMCA notices. Megaupload thus has shown a strong probability of success on its claims against UMG—claims for misrepresentation under Section 512(f) of the Copyright Act and for a declaratory judgment that Megaupload owns the copyright in the video and has the right to post it where it pleases. Accordingly, a temporary restraining order and preliminary injunction should issue enjoining UMG from making any further attempts to block access to the video, including sending any further takedown notices to YouTube or other service providers.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## STATEMENT OF FACTS

### A.    Plaintiff's and Defendant's Businesses

Megaupload is a leading provider of online storage and data transmission services. Decl. ¶ 2. Over 180 million registered users use these services, including employees of nearly 90% of Fortune 500 companies. *Id.* ¶ 3. Megaupload has worked with artists and owners of creative content to develop innovative technologies that allow them to make their content available and then be compensated every time someone downloads their creations. *Id.* ¶ 27. These cooperative relationships are allowing artists to reach consumers in ways they never could before. This cooperation is one of the key messages Megaupload is conveying through its promotional campaign.[1] *Id.* ¶ 27.

UMG is a traditional music content company conducting business in recorded music, music publishing, and merchandising.

### B.    The creation of the Megaupload Video

On or about December 9, 2011, Megaupload re-launched its website, featuring endorsements by the top stars of the day, including Sean "Diddy" Combs, will.i.am, Kanye West, Chris Brown and many others. *Id.* ¶¶ 6-8. This re-launch included the use of the Megaupload Video, a promotional song and video created and produced by Megaupload. *Id.* ¶¶ 5-8, Exh. B. The Megaupload Video contains snippets from celebrities who agreed to participate and consented in writing to their appearances and performances in it. *Id.* ¶¶ 6-7. Spoken endorsements in the video included Kasseem Dean (also known as Swizz Beatz), Kanye West, Mary J. Blige, Estelle Swaray (Estelle), Ciara Harris (Ciara), Jayceon Taylor (Game), Carmelo Anthony, Will Adams (will.i.am), Kim Kardashian, Sean Combs (Diddy), Floyd Mayweather, Jamie Foxx, Jonathan Smith (Lil Jon), Brett Ratner, Serena Williams, and Russell Simmons. Musical performers in the Megaupload Video included Printz Board and George Pajon Jr. of the Black Eyed Peas band, as well as Macy Gray. *Id.* ¶ 7.

---

[1] As a responsible online service provider, Megaupload opposes online piracy of copyrighted content. *Id.* ¶ 4. Megaupload's operations are fully compliant with and protected by the Digital Millennium Copyright Act (DMCA), and Megaupload cooperates with rights-holders to combat abuse of the powerful tools that we provide. *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Megaupload carefully planned the creation and release of the Megaupload Video to show the legitimacy and widespread use of its service. *Id.* ¶ 5. To capitalize on the narrow window of opportunity presented by the planned re-launch of its website, Megaupload invested heavily in developing the Megaupload Video, ensuring that the music, number and selection of celebrities, and design would appeal to a large audience that would then continue virally to spread the word. *Id.* ¶¶ 5, 27.

As planned, the Megaupload Video became an instant viral online sensation. *Id.* ¶ 9, Exh. C. Numerous other persons uploaded it to YouTube and it was viewed by hundreds of thousands of visitors. *Id.* Within hours, it was the top trending topic on Twitter. *Id.* ¶ 10, Exh. D. Global news media reported about and linked to the video utilizing an embedded video player from the leading online video site, YouTube.com. *Id.* ¶ 10.

UMG owns nothing in the Megaupload song or video. *Id.* ¶ 12. In creating the Megaupload Video, Megaupload signed agreements with all the participating artists. *Id.* ¶¶ 6, 12, Exh. A. Megaupload was made the "sole owner of the results and proceeds of the Appearance," and the artist/celebrity waived "any interest I may have in and to the copyright in connection therewith." *Id.* The Megaupload Video includes 100% original content, created and owned by Megaupload. *Id.* ¶¶ 5-7, 12.

### C.   Plaintiff Already Has Been Seriously Harmed, and Absent an Immediate Injunction, Will Be Irreparably Injured.

UMG sabotaged the Megaupload Video campaign by causing YouTube and numerous others to disable access to Megaupload's creation. The day of the launch, YouTube removed access to the video, after receiving a copyright complaint from UMG. *Id.* ¶¶ 11-14, Exhs. E & F. UMG continued to give notice to other sites, resulting in displacement in numerous online locations. *Id.* ¶¶ 14, 16-21, Exhs. H–L.

UMG has made no secret of its disdain for Megaupload, having publicly alleged in the past through its lobbying organization that Megaupload is not a legitimate business. *Id.* ¶ 28, Exh. P. UMG saw the DMCA takedown process as an effective method to censor Megaupload's marketing. It has used the process to suppress the fact that many of today's top recording artists

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  actively use and support Megaupload's services. *Id.* ¶ 29. By disabling access to key locations

2  throughout the internet, UMG's interruption of Megaupload's viral marketing campaign is

3  causing incalculable losses in the number of people who can be reached. *Id.* ¶¶ 29-31.

4    Megaupload is also suffering incalculable damage to its goodwill as a result of the

5  message that users receive when they try to click on a link to the Megaupload Video that has been

6  disabled: instead of being able to watch the video and hear a positive message about Megaupload,

7  users receive a false message alleging infringement of UMG's copyrights. *Id.* ¶¶ 14, 16-18, 31,

8  Exhs. F, H, I.

9    Unless UMG is enjoined from sending further takedown notices in relation to the

10  Megaupload Video, this immeasurable harm that Megaupload is suffering will continue unabated.

11  *Id.* ¶ 32. Under the DMCA, the initial postings of the video will remain disabled and rerouted to

12  the false allegation of infringement for at least two weeks—or if UMG within that time files a

13  lawsuit in response to Megaupload's counter-notice, indefinitely. *Id.* ¶ 25. Moreover, as

14  additional copies of the video virally spread across the Internet, UMG can send additional

15  takedown notices, effectively blocking the video wherever it appears and exposing users to the

16  false message that Megaupload is infringing. *Id.* ¶¶ 16-17, 22, 26, 29-32.

17                            **ARGUMENT**

18  **I.    STANDARD FOR PROVISIONAL RELIEF**

19    The standard for obtaining a temporary restraining order and the standard for obtaining a

20  preliminary injunction are the same. *California Independent System Operator Corp. v. Reliant*

21  *Energy Sers., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001). To obtain such relief, a plaintiff

22  generally "must establish that he is likely to succeed on the merits, that he is likely to suffer

23  irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

24  and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council,*

25  *Inc.*, 555 U.S. 7, 20 (2008). Alternatively, "[a] preliminary injunction is appropriate when a

26  plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of

27  hardships tips sharply in the plaintiff's favor, ... so long as the plaintiff also shows that irreparable

28  injury is likely and that the injunction is in the public interest." *Alliance for the Wild Rockies v.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1 | *Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

2 | **II.    THE DMCA IS DESIGNED TO PROVIDE EFFECTIVE NOTICE AND**

3 | **TAKEDOWN PROCEDURES—AND ALSO TO RESTRAIN THEIR ABUSE.**

4 |     **A.    Rights of Content Owners and Internet Service Providers under DMCA**

5 |     Under the DMCA, Internet Service Providers (ISPs) that store information at the request

6 | of users are eligible for safe harbors limiting their liability to content owners for incidental acts of

7 | copyright infringement. 17 U.S.C. § 512(c) & (g)(4). Once an eligible ISP receives actual

8 | knowledge of allegedly infringing material, it loses these safe harbor protections unless it

9 | immediately complies with the DMCA procedures for removing that material. *Id.* Specifically,

10 | an ISP that receives a facially complying "takedown notice"[2] must respond "expeditiously to

11 | remove, or disable access to, the material that is claimed to be infringing or to be the subject of

12 | infringing activity." *Id.* Failure to respond to notices exposes ISPs to liability for the full

13 | remedies of the Copyright Act, including statutory damages of up to $150,000 per work for

14 | willful infringement. 17 U.S.C. § 504. Such exposure makes any notice of infringement a

15 | powerful threat that effectively compels removal by the ISP upon receipt.

16 |     ISPs that store information at the request of users are also eligible for safe harbors limiting

17 | their potential liability to their *subscribers* for taking down materials improperly. 17 U.S.C.

18 | § 512(g)(1). To qualify for this safe harbor, the ISP must take steps to allow subscribers whose

19 | content was taken down to submit a "counter notification" indicating that the removed content

20 | was "was removed or disabled as a result of mistake or misidentification." *Id.* § 512(g)(3).

21 | However, ISPs (like YouTube) can and do limit their liability to subscribers in any event by terms

22 | of use that provide them discretion to disable materials. The threat of a lawsuit by a subscriber is,

23 | therefore, generally a trivial consequence compared to the risk of a lawsuit by a copyright owner.

24 | *See* Jennifer M. Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown*

25 |

26 | [2] Section 512(c)(3) requires a takedown notice to include, *inter alia*, identification of the allegedly infringing material, as well as a "statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright

27 | owner, its agent, or the law" and a "statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the

28 | owner of an exclusive right that is allegedly infringed."

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*Notices Under Section 512 of the Digital Millennium Copyright Act*, 22 Santa Clara Computer & High Tech. L.J. 621, 626 n.14 & 629 (2006) (noting that service providers usually limit their liability for removals through terms of service, so the Section 512(g) limitation on that liability does not encourage them to restore counter-noticed material). In this case, for example, Megaupload cannot sue YouTube for wrongful disablement if YouTube's terms of service vest it with discretion. Thus, needing little protection from their subscribers' claims, many ISPs do not even find it worthwhile to implement a counter notice procedure. In all events, after a claim by a rights holder of purported infringement, the ISP's economic incentives are overwhelmingly weighted towards disabling content. *Id.*

Moreover, for those ISPs who do permit counter notices, in order to retain protection against claims of purported copyright owners, the DMCA safe harbor does not allow the ISP to restore access to the removed content sooner than *ten business days* following receipt of the counter notice. 17 U.S.C. § 512(g)(2)(C). Access need not be restored at all if the entity who provided the takedown notice informs the ISP that it "has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network." *Id.* If UMG were to file a lawsuit—however baseless—asserting an ownership interest, it could indefinitely preclude access to the Megaupload Video.

## B. Prohibition of Misrepresentations

To guard against abuse of the DMCA's notice-and-takedown regime, Section 512(c) requires that all notices be sworn under oath. *See* n. 2, *supra.* Further, Section 512(f) creates a cause of action against "[a]ny person who knowingly materially misrepresents... that material or activity is infringing" in a takedown notice resulting in the removal of such material by the ISP. 17 U.S.C. § 512(f); *see also, e.g., Amaretto Ranch Breedables v. Ozimals, Inc.*, No. 10-05696-CRB, 2010 WL 5387774, at *2 (N.D. Cal. Dec. 21, 2010) (observing that § 512(f) supports an independent cause of action). Under Section 512(f), a plaintiff must first establish that defendant falsely misrepresented a claim of copyright infringement. *See* 17 U.S.C. § 512(f). To establish copyright infringement, an alleged owner must show (1) ownership of the copyright, and (2) copying of the protected expression by the defendant. *Sun Microsystems, Inc. v. Microsoft Corp.*,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

188 F.3d 1115, 1119 (9th Cir. 1999).  Thus, misrepresenting ownership of an alleged copyright

gives rise to a Section 512(f) claim.

### C.    Injunctive Relief for Misrepresentations

Preliminary injunctions provide an equitable remedy available where money damages will

not adequately compensate for ongoing and future harms.  *See, e.g., Owner Operator Indep.*

*Drivers Ass'n, Inc. v. Swift Transp. Co.*, 367 F.3d 1108, 111 (9th Cir. 2004) (describing

traditional equitable principles applicable to petitions for injunctive relief that seek to prevent or

deter statutory violations).  Injunctions are available actions under DMCA Section 512(f) as they

are in other cases.  *See Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452 (N.D. Cal. 2007)

(granting preliminary injunction against wrongful § 512(f) notices); *Amaretto Ranch Breedables*,

2010 WL 5387774, at *3 (issuing restraining order against wrongful § 512(f) notices).

Courts consistently have recognized the serious harms that false takedown notices may

cause.  *See, e.g., id.; Biosafe-One*, 524 F. Supp. 2d at 468.  "The unnecessary removal of non-

infringing material causes significant injury to the public where time-sensitive or controversial

subjects are involved and the counter-notification remedy does not sufficiently address these

harms."  *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1156 (N.D. Cal. 2008).

Accordingly, courts have readily granted injunctive relief against misuse of the DMCA's notice-

and-takedown regime, even to the extent of ordering non-party online service providers to restore

the removed material.  *See Biosafe-One*, 524 F. Supp. 2d at 468; *Amaretto Ranch Breedables*,

2010 WL 5387774 at *3.  Where, as here, a Plaintiff faces ongoing, continuing violations,

injunctive relief is warranted to compel compliance with the statute.

### III.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS MISREPRESENTATION CLAIM UNDER DMCA § 512(f) AND ITS CLAIM FOR DECLARATORY RELIEF OF COPYRIGHT OWNERSHIP.

Because UMG had no involvement in the creation of the music or other content in the

Megaupload Video, it is beyond legitimate dispute that UMG knowingly and materially

misrepresented that the Megaupload Video infringed UMG's copyrights.

### A.    UMG's Takedown Notices Contained Misrepresentations.

UMG's takedown notices misrepresented that the Megaupload Video infringed a

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

copyright owned or represented by UMG. *See Online Policy Group*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (finding a misrepresentation where the defendant "sought to and did in fact suppress publication of content that is not subject to copyright protection"). The Megaupload Video is an independent creative work. Decl. ¶¶ 5-7, 12, Exh. B. It was commissioned, written, and performed with original music and imagery specifically for Megaupload. *Id.* ¶ 12. The Megaupload Video does not incorporate elements of any other song or video. *Id.* And the artists who created the Megaupload Video fully consented to its use by Megaupload, which commissioned it in the first place. *Id.* ¶ 6, Exh. A. UMG lacks any basis to claim that this work infringes its copyrights. *Id.* ¶¶ 5-7, 12.

UMG has publicly acknowledged that it submitted the takedown notices, but initially asserted that it was justified because the video purportedly contained an unauthorized performance by its artist Gin Wigmore. Decl. ¶ 21. But Ms. Wigmore did not even appear in, much less author the Megaupload Video. *Id.*

It has also been reported that an attorney for will.i.am claimed that the video was unauthorized, but will.i.am personally advised Megaupload on December 12, 2011 that he absolutely had not authorized the submission of any takedown notice on his behalf. Decl. ¶ 13. Plaintiff obtained licenses from each of the persons who appeared in the Megaupload Video, including will.i.am. *Id.* ¶ 6, Exh. A. In the agreement he signed, will.i.am explicitly "waive[d] any interest [he] may have in and to the copyright in connection therewith," agreeing that Plaintiff is its sole owner. *Id.*, Exh. A.

Further, will.i.am, like his fellow artists and celebrities, provided exceedingly broad consents to Plaintiff recording his performance and interview (called the "Appearance"), editing it, and publishing it on the Internet through streaming media, precisely as Plaintiff has done. The release agreements granted Megaupload the right to, among other things,

> "copyright, record, reproduce, broadcast, distribute, edit, publish, exhibit, disseminate, couple and use in any way throughout the universe and in perpetuity the audio and/or visual portions of any videotape, film, pictures, negatives, prints, photographs, stills or other recordings of the Appearance, and any reproduction thereof."

*Id.* These celebrities also relinquished any right to inspect or approve any finished product or

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

"derivatives thereof, or any subsequent uses made of the Appearance," further establishing that Plaintiff is authorized to include the Appearances in the Megaupload Video. *See id.* Further, the celebrities expressly warrant that they "have the power and right to grant the rights herein granted." *Id.*

In short, the agreement gave Plaintiff the copyright to will.i.am's performance and the sole discretion to decide how to present it to the public. Plaintiff has similar licenses with the other artists and celebrities who appeared in the Megaupload Video, including UMG artists Kanye West, Sean "Diddy" Combs, and Mary J. Blige. *Id.* ¶ 6. If UMG claims that Plaintiff's video contains unlicensed copyrighted content of its artists, that claim holds no water. [3]

In addition, even ignoring these agreements, celebrity appearances in the Megaupload Video could not have given them *copyright* interests in the work. It has long been established that a person appearing in a film is not the author of the film, and is not the owner of the copyright in it. *See Burrow-Giles Lithographic v. Sarony*, 111 U.S. 53, 60 (1884) (subject of photograph is not its author); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1232-34 (9th Cir. 2000) (consultant/voice over provider was not "joint owner" of copyright in movie). The author of a film is the "inventive or master mind," not every lesser individual contributor. *Aalmuhammed*, 202 F.3d at 1235.

UMG's misrepresentation of its copyright interest is likely not the only misrepresentation in UMG's takedown notices. Although Plaintiff does not yet have access to the specific takedown notice about the Megaupload Video, among other elements, the DMCA *requires* that a takedown notice: identify both the work allegedly infringing the copyright, and the copyrighted work allegedly infringed; state that the complaining party has a good faith belief that use of the material is not authorized by the copyright holder or by law; state that the information in the notice is accurate; and state, under penalty of perjury, that the complaining party either owns or is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed. 17 U.S.C. § 512(c)(3). YouTube's usual form requires that all of the latter three statements be

---

[3] The contracts also preclude any conceivable claim for violation of some other right, such as a right of publicity. In any event, it would be a false representation to assert ownership of a copyright as a basis to take down a work where only a right of publicity were at issue.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  made under penalty of perjury.  Decl. ¶ 11, Exh. E.  UMG had to make multiple

2  misrepresentations in order to assert its DMCA claim.

3      **B.    UMG's Misrepresentations Were Knowing**

4      A party "knowingly" misrepresents that material is infringing if it "actually knew, should

5  have known if it acted with reasonable care or diligence, or would have had no substantial doubt

6  had it been acting in good faith, that it was making misrepresentations." *Online Policy Group*,

7  337 F. Supp. 2d at 1204.  Reasonable care or diligence includes, at the very least, a review of the

8  allegedly infringing material and assessment of its content.  "The DMCA already requires

9  copyright owners to make an initial review of the potentially infringing material prior to sending a

10  takedown notice; indeed, it would be impossible to meet any of the requirements of Section

11  512(c) without doing so." *Lenz*, 572 F. Supp. 2d at 1155.

12      In *Online Policy Group*, defendant Diebold made takedown requests alleging copyright

13  infringement by the publication of a collection of technical emails describing flaws in its

14  products. 337 F. Supp. 2d at 1204.  Diebold was unable to identify any copyrighted material in

15  the subject emails, and this Court found their publication to be fair use of any material that may

16  have been copyrighted, so Diebold's copyright claim was a misrepresentation. *Id.* at 1203-04.  As

17  a matter of law, Diebold's misrepresentation was knowing, because "no reasonable copyright

18  holder could have believed" that the material was infringing. *Id.*  Further, Diebold "knew—and

19  indeed that it specifically intended—that its letters to [ISPs] would result in prevention of

20  publication of that content." *Id.* at 1204.

21      Here, there can be no question that UMG knew or should have known it had no exclusive

22  right to any material in the Megaupload Video.  The song contained in the Megaupload Video is

23  an original composition, and the video was created to feature it.  Decl. ¶¶ 5-7, 12, Exh. B.  The

24  celebrities who appear in the Megaupload Video agreed to participate, and executed license

25  agreements with Megaupload.  *Id.* ¶ 6, Exh. A.  The video heaps praise on Megaupload for being

26  fast, secure, free, and providing the best way to upload or send files—ideas that are anathema to

27  UMG and that it would never have permitted to be recorded in anything that UMG itself owned.

28      This is not a close call in which reasonable minds may disagree.  This case raises no

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  questions about whether the use of another's work is fair or infringing, which may call for

2  difficult balancing of multiple factors. *See, e.g.*, *Lenz*, 572 F. Supp. 2d at 1155 (holding that

3  copyright owners may run afoul of Section 512(f) if they issue a takedown notice without proper

4  consideration of fair use). Moreover, UMG is a sophisticated corporation and a frequent

5  copyright litigant. *See, e.g.*, *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175 (9th Cir. 2011);

6  *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267 (6th Cir. 2009); *UMG Recordings,*

7  *Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009); *UMG Recordings, Inc. v.*

8  *MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000). UMG is in the business of producing and

9  distributing copyrighted works, as well as submitting DMCA notices, and enforcing its copyrights

10  in the courts. In this case, it is simply not possible for UMG to have even a subjective good-faith

11  belief that the challenged material infringed its copyright.

12  But even assuming, for the purpose of argument, that UMG could claim it subjectively

13  believed that a video—which did not incorporate any of its content—might somehow infringe its

14  copyrights, UMG would certainly have no basis for such belief had it "acted with reasonable care

15  or diligence." The artist whose use is publicly reported to have sparked UMG's ire, Gin

16  Wigmore, does not even appear in the video. will.i.am., who does appear in the work, released all

17  rights. It defies any standard of diligence not to review the work and confer if necessary with an

18  artist, before purportedly acting as the artist's representative to disable it. To continue to strike

19  repeatedly, and to not agree to restore the work after a counter-notice, smacks of malice.

20  YouTube provides a readily available process for retraction; but UMG has refused to do so. Decl.

21  ¶ 24, Exh. O.

22  Nor could UMG conceivably justify its conduct based on a purported belief that some

23  right other than copyright, such as rights of publicity, were being infringed. First, as the record

24  reflects, *all* rights were granted by the performers, not just copyrights, so a claim of other rights

25  would also be false. Second, the notices UMG sent invoked *copyrights*: the websites disabling

26  the video reported that copyright claims, not other violations, were the reason content was

27  disabled. *See, e.g.*, *Id.* ¶¶ 14, 18, Exhs. F, I; *compare* ¶ 15, Exh. G (different YouTube.com

28  notice where non-copyright claims are asserted). Third, the Ditigal Millenium *Copyright* Act

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  applies to copyrights, requiring that a notice purporting to invoke the statute come only from a

2  party who identifies the "copyrighted work claimed to be infringed," with a statement that use "is

3  not authorized by the copyright owner, its agent or the law." 17 U.S.C. § 512(c)(3)(A)(ii), (v).

4  No claim based on purported rights other than copyright can conceivably justify UMG's DMCA

5  notices.

6  　　UMG did not cease sending takedown notices even after this action was filed, and its

7  recent actions shed an even brighter light on its bad faith misuse of the DMCA process. On

8  December 12, 2012 UMG disabled access to an episode of an online news show, Tech News

9  Today, merely because it contained a segment *discussing* the takedown dispute between UMG

10 and Megaupload. Decl. ¶¶ 19-20, Exhs. J–L. During the course of this news report, the show

11 played an excerpt of the Megaupload Video, in order to analyze and comment on the parties'

12 positions. *Id.* The total show lasted approximately 45 minutes, of which less than five minutes

13 are devoted to the Megaupload Video and UMG's efforts to censor it. *Id.* Tech News Today (as

14 usual) posted its show to YouTube and other websites. *Id.* In this context of news reporting and

15 criticism, display of the video was obviously fair use, regardless of who owned its copyright. *See*

16 17 U.S.C. §107. Incredibly, UMG had the entire show taken down by sending a takedown notice

17 to YouTube, claiming that the Tech News Today episode violated its copyrights. *Id.* When Tech

18 News Today filed a counter-notice, after a brief restoration, UMG knocked the show off the air

19 again by sending yet another notice. *Id.*

20 　　UMG cannot *at this point* continue to pursue its previously issued takedown notices or

21 issue any new one in good faith. Any continuing attempt to quell distribution of the Megaupload

22 video based on copyrights UMG does not own or control would be naked abuse of the statute and

23 must be enjoined.

24 　　This case is thus similar to *Online Policy Group*, where Diebold used the "DMCA's safe

25 harbor provisions—which were designed to protect ISPs, not copyright holders—as a sword to

26 suppress publication of embarrassing content rather than as a shield to protect its intellectual

27 property." *See Online Policy Group*, 337 F. Supp. 2d at 1205. The only reasonable conclusion to

28 be drawn from UMG's actions here is that UMG is engaged in the same abuse. UMG's

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*EX PARTE* APPLICATION FOR TRO AND　　　13　　　Case No. CV-116216-CW
OSC RE PRELIMINARY INJUNCTION

philosophical opposition to cloud storage companies gives it no legal right to use the DMCA as a sword to suppress Megaupload's message that popular recording artists favor Megaupload.

## C. UMG's Misrepresentations Were Material

A misrepresentation is material if it "affected the ISP's response to a DMCA letter." *Id.* at 1204. Courts interpret this as a requirement that the service provider removed material in response to the takedown notice. *See id.* (finding misrepresentation was material where service providers removed the challenged email archive); *Ground Zero Museum Workshop v. Wilson*, No. DKC 09-3288, 2011 WL 3758582 (D. Md. Aug. 24, 2011).

UMG's takedown notices have had their intended effect of removing the Megaupload Video from YouTube and other locations. Decl. ¶¶ 14, 16-21, Exhs. H–L. UMG's takedown notices have kept the Megaupload Video down even after Megaupload informed YouTube and others that the video did not infringe. *Id.* ¶¶ 23-24. Here, as in *Online Policy Group*, the takedown notices are material because they "resulted in removal of the content from websites and the initiation of the present lawsuit." 337 F. Supp. at 1204.

In sum, Megaupload has demonstrated that UMG knowingly materially misrepresented that the Megaupload Video is infringing. Plaintiff is likely to succeed on the merits of its claim under 17 U.S.C. § 512(f), as well as on its request for declaratory relief that it, not UMG, owns all copyright interests in the Megaupload Video.

## IV. UMG'S ACTIONS TO REMOVE CONTENT IT DOES NOT OWN HAS CAUSED, AND CONTINUES TO CAUSE, IRREPARABLE HARM TO MEGAUPLOAD.

By causing the removal of the Megaupload Video just as it was gaining tremendous popularity among Internet users, UMG is undermining Megaupload's opportunity to make a memorable and positive impression on millions of prospective users of Megaupload's services. Just as importantly, by falsely accusing Megaupload of infringement, UMG is using the DMCA to attack Megaupload's reputation as a responsible provider of file services—the very reputation that Megaupload's investment in the Megaupload Video and its numerous endorsements was designed to enhance. As just two examples, as a result of UMG's notice, YouTube now reports that "This video is no longer available due to a copyright claim by UMG," while imgur.com

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1 reports that "This video contains content from UMG, who has blocked it on copyright grounds."

2 Decl. ¶¶ 14, 18, Exhs. F, I. UMG's conduct both prevents Megaupload from creating positive

3 goodwill by its promotional video, and simultaneously tears down its goodwill by propagating

4 false insinuations of infringement.

5     As the Ninth Circuit has held, "intangible injuries that are incapable of measurement, like

6 reputation or goodwill, may constitute irreparable harm." *Rent-A-Center, Inc. v. Canyon*

7 *Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (affirming preliminary

8 injunction to protect the plaintiff's "advertising efforts and goodwill"). A threatened loss of

9 prospective customers also constitutes irreparable harm. *Stuhlbarg Int'l Sales Co. v. John D.*

10 *Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp.

11 2d 1023, 1037 (C.D. Cal. 2010) (granting preliminary injunction in light of threatened loss of

12 prospective customers who, absent such relief, would not visit the plaintiff's website).

13     Bad DMCA notices have been enjoined to prevent such harms. In a Section 512(f) case

14 involving faulty takedown notices submitted to eBay accusing one of its vendors, the court found

15 that past and continued submission of such notices "would likely deter prospective customers and

16 adversely affect plaintiff's reputation and goodwill on a web site from which it generates 95

17 percent of its revenues." *Design Furnishings, Inc. v. Zen Path, LLC*, 2010 U.S. Dist. LEXIS

18 135819, at *22-23 (E.D. Cal. Dec. 23, 2010). The court found that even a temporary interruption

19 in the plaintiff's ability to market and list its products as the result of flawed takedown notices

20 could constitute irreparable harm. *Id.*; *see also Biosafe*, 524 F. Supp. 2d at 468 (ordering service

21 provider to reinstate party's website that was subject of faulty takedown notices despite party's

22 ability to market its products through other websites). Moreover, being the target of repeated

23 takedown notices could result in the ISP terminating the plaintiff's ability to use that ISP's

24 services to market and sell products. *Zen Path, LLC*, 2010 U.S. Dist. LEXIS 135819, at *22-23.

25 Accordingly, the court in *Zen Path* found that potential availability of counter notifications under

26 the DMCA that might eventually resuscitate the removed content would not allow the plaintiff to

27 overcome the irreparable harm in the absence of a preliminary injunction. *Id.*

28     Similarly, Megaupload has lost and continues to lose its opportunity to market its service

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   through the popularity of its now-removed video. The reason for that sudden popularity was the

2   combination of many of today's hottest artists and celebrities in a single, catchy, original video.

3   Megaupload carefully planned the creation and release of the Megaupload Video to show the

4   legitimacy and widespread use of the Megaupload service. Decl. ¶ 5. To capitalize on the narrow

5   window of opportunity presented by its relaunch, Megaupload invested heavily to ensure that the

6   music, number and selection of celebrities, and video design would appeal to a large audience that

7   would then continue virally to spread the word. *Id.* ¶¶ 5, 28.

8        UMG's takedown notices and the resultant disablement of the video on YouTube and

9   other popular websites have torpedoed Megaupload's main marketing tool and trampled its rights

10   of free speech. Just as a preliminary injunction was needed in *Zen Path* to ensure that a

11   competitor would not even temporarily interfere with the plaintiff's online marketing efforts, it is

12   critical here that the Court allow no more days to elapse while the Megaupload Video risks

13   becoming stale. *See Zen Path, LLC*, 2010 U.S. Dist. LEXIS 135819, at *22-23; *see also*

14   *Amaretto Ranch*, 2010 WL 5387774, at *2 (granting preliminary injunction because irreparable

15   harm of permanent loss of prospective customers would result from delayed online marketing and

16   availability of product).

17        The harm from UMG's misrepresentations here is exacerbated by the fact that, when

18   UMG submits DMCA notices targeting viral posts by others, because Megaupload is not the

19   poster, it does not even receive notice of the takedown. Decl. ¶ 26. Thus, as to all of those viral

20   distributions (such as the ones at Huffington Post, Vimeo, imgur.com, and other sites)

21   Megaupload has no ability to provide counter-notices to even attempt to restore the video. *Id.* To

22   provide complete relief, an injunction therefore must require UMG not only to cease giving false

23   notices, but also to honor Megaupload's requests to withdraw UMG's past invalid notices about

24   the Megaupload Video.

25        Finally, without provisional relief, Megaupload would face the prospect of having UMG

26   continue to issue baseless takedown notices that tar Megaupload as a purported infringer. *Id.*

27   ¶ 32. Because Megaupload actively seeks the support of additional artists and their fans, the

28   UMG takedown notices are particularly injurious. To protect Megaupload's reputation and

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   ensure that Megaupload can continue to use popular marketing channels such as YouTube,[4] a

2   temporary restraining order is necessary.

3   **V.   THE BALANCE OF HARM SHARPLY FAVORS MEGAUPLOAD BECAUSE OF ITS NEED TO HAVE ITS OWN PROMOTIONAL VIDEO WIDELY AVAILABLE**

4   **NOW, WHEN THE VIDEO IS FRESH AND POPULAR.**

5   "In each case, a court must balance the competing claims of injury and must consider the

6   effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v.*

7   *Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987).

8   In *Zen Path*, the court found the balance of harms favored provisional relief because the

9   takedown notices, and the ISP's likely responses to those numerous notices, "would likely cause

10   plaintiff to lose prospective customers, goodwill, and its reputation." *Zen Path*, 2010 U.S. Dist.

11   LEXIS 135819, at *20. Likewise, here the balance of hardships tips sharply in Megaupload's

12   favor because the delay or unavailability of the once-popular Megaupload Video will cost

13   MegaLoad prospective customers and goodwill. Further, responding to takedown notices and

14   preparing counter notices, or finding alternative service providers to accept Megaupload's

15   marketing content, would wrongfully force Megaupload to expend unnecessary time, resources,

16   and attention. *See Biosafe*, 524 F. Supp. 2d at 469 ("if plaintiffs continue to send DMCA notices

17   defendants will be burdened, financially and otherwise, with arranging for alternative companies

18   to host their website")

19   UMG, on the other hand, has no cognizable harm from the showing of the Megaupload

20   Video that includes not a shred of content owned by UMG. Thus the balance of harms not only

21   favors, but sharply favors, Megaupload—further supporting the need for provisional relief against

22   UMG's interference with the distribution and display of the Megaupload Video. *See id.* (granting

23   preliminary injunction despite skepticism about the ultimate merits, because "barring plaintiffs

---

[4] YouTube's policy states that "[r]epeat infringers' videos are removed and their accounts are terminated and permanently blocked from using YouTube." *See* http://www.youtube.com/t/copyright_faq. In this case, UMG's repeated, incorrect notice have already led YouTube to issue an automated notice that Megaupload is subject to having its account terminated for display of its own video! Decl. ¶ 14, Exh. M. This presents an independent basis for an injunction against further false notices. The possible availability of other websites for marketing does not alter the irreparable nature of the harm. *See Biosafe*, 524 F. Supp. 2d at 468.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  from sending additional DMCA notices, absent court approval . . . would impose little or no

2  burden on plaintiffs.")[5]

3  **VI.    PUBLIC INTEREST IS NOT SERVED BY FALSE TAKEDOWN NOTICES.**

4            The public interest portion of the preliminary injunction test asks "whether there exists

5  some critical public interest that would be injured by the grant of preliminary relief." *Indep.*

6  *Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (quoting

7  *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed.Cir.1988)).  The *Zen Path* court

8  explained that the public interest in a Section 512(f) case is served by the grant of provisional

9  relief against wrongful takedown notices, by placing the burden of proving infringement on the

10  claimed copyright holder, just as it would be under the Copyright Act.  *Zen Path*, 2010 U.S. Dist.

11  LEXIS 135819, at *25-26.  Because Section 512 causes ISPs to implement policies to avoid

12  liability for intellectual property infringement in a way that essentially presumes infringement, the

13  court concluded that "[t]o withhold a preliminary injunction would allow anyone to effectively

14  shut down a competitor's business on eBay simply by filing numerous notices."  *Id. at* *26.

15            Likewise, here, even assuming *arguendo* that UMG's takedown notices had an iota of

16  merit, it would be appropriate to require UMG to prove that, and to grant Megaupload provisional

17  relief until UMG does so.  *See id.*  In fact, UMG's takedown notices lack even an iota of

18  credibility.  Megaupload, alone, created the Megaupload Video with original content from

19  individuals who fully consented to its use.  Decl. ¶¶ 5-7, 12.  No public interest would be served

20

21  [5] Where, as in this case, damage will not result from the issuance of a TRO or preliminary
   injunction, a court has discretion to determine that a bond is unnecessary.  *See, e.g.*, *Jorgensen v.*
22  *Cassiday*, 320 F.3d 906, 911 (9th Cir. 2003) (affirming decision of trial court where no
   meaningful harm would result from issuance of injunction).  There is no conceivable legitimate
23  harm that could result from the injunction sought by Megaupload here, which merely seeks to
   enjoin UMG from pursuing takedown notices falsely representing that it authorized to act on
24  behalf of the owner of the copyright in the Megaupload Video—which it never had any right to
   do in the first place.  *See also Scherr v. Volpe*, 466 F.2d 1027, 1035 (1972) (strong showing on
25  likelihood of success on the merits provides basis for denying bond entirely).

26  Moreover, even if—contrary to fact— UMG could ever prove it owned copyrighted content in the
   Megaupload Video, the use of that content would be compensable through a claim for
27  infringement.  *See Amaretto Ranch*, 2010 WL 5387774, at *3 ("Defendant can obtain money
   damages from Plaintiff if Plaintiff is in fact infringing Defendant's copyright.")  Thus, the
28  requested *injunction* would not impose any injury that must be bonded because any such injury
   would be recoverable in the ordinary course.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

by allowing the issuer of false takedown notices to avoid being subject to provisional relief. To the contrary, the public interest in free speech and robust exchange of ideas strongly favors the availability of exactly this sort of information. "The unnecessary removal of non-infringing material causes significant injury to the public where time-sensitive or controversial subjects are involved." *Lenz*, 572 F. Supp. 2d at 1156.

## CONCLUSION

Because consideration of the merits, irreparable harm, balance of harms, and public interest all favor Megaupload, the Court should enjoin UMG from further interfering with the performance, display, or availability of the Megaupload Video, on the terms of the Proposed Order submitted with this motion.

Dated:    December 14, 2011

ROTHKEN LAW FIRM

By:  _____ */s/ Ira P. Rothken* _____
                  Ira P. Rothken

FENWICK & WEST LLP

By:  _____ */s/ Laurence F. Pulgram* _____
                  Laurence F. Pulgram

Attorneys for Plaintiff
MEGAUPLOAD LTD.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW