MUNGER, TOLLES & OLSON LLP
KELLY M. KLAUS (SBN 161091)
Kelly.Klaus@mto.com
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

MUNGER, TOLLES & OLSON LLP
JONATHAN H. BLAVIN (SBN 230269)
Jonathan.Blavin@mto.com
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA  94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for Defendant
UNIVERSAL MUSIC GROUP, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| MEGAUPLOAD LTD., | CASE NO.  C-11-6216 CW |
|---|---|
| Plaintiff, | **DEFENDANT'S OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER** |
| v. | |
| UNIVERSAL MUSIC GROUP, INC., | Judge:        Honorable Claudia Wilken |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..............................................................................................1

II.   FACTUAL BACKGROUND.............................................................................2

    A.    Megaupload ...........................................................................................2

    B.    Background Events Regarding the Video................................................4

III.  MEGAUPLOAD SEEKS AN EXTRAORDINARY REMEDY .......................6

IV.   MEGAUPLOAD FAILS TO SHOW IT IS ENTITLED TO INJUNCTIVE
    RELIEF.............................................................................................................7

    A.    17 U.S.C. § 512(f) Does Not Authorize *Ex Parte* Relief or an Injunction .............7

    B.    Megaupload Does Not and Cannot Demonstrate Immediate and Irreparable
        Injury....................................................................................................11

    C.    Megaupload Has Not Established a Likelihood of Success (or Even Serious
        Questions) on the Merits.......................................................................12

        1.    Megaupload Has Not Established That UMG Sent a "Takedown
               Notice" to YouTube Under the DMCA....................................12

        2.    Megaupload Misstates the Governing "Good Faith" Standard Under
               Section 512(f) and Has Not Pled, Much Less Demonstrated, Facts
               Establishing Liability................................................................14

    D.    The Remaining Equitable Factors Weigh Against Injunctive Relief ...................16

    E.    The Injunction That Megaupload Requests Improperly Goes Far Beyond
        the Scope of Its Claims .........................................................................17

V.    CONCLUSION................................................................................................18

1

## TABLE OF AUTHORITIES

2

Page

3

4

**FEDERAL CASES**

5

*Amaretto Ranch Breedables v. Ozimals, Inc.*,
   2010 WL 5387774 (N.D. Cal. Dec. 21, 2010)..........................................................................10

6

7

*Biosafe-One, Inc. v. Hawks*,
   524 F. Supp. 2d 452 (S.D.N.Y. 2007) .................................................................................10

8

*Cabell v. Zimmerman*,
   2010 WL 996007 (S.D.N.Y. Mar. 12, 2010) ......................................................................15

9

10

*City of Colton v. Am. Promotional Events, Inc.-West*,
   614 F.3d 998 (9th Cir. 2010) ..............................................................................................10

11

12

*Cramer v. Target Corp.*,
   2010 WL 2232400 (E.D. Cal. June 3, 2010) .......................................................................11

13

*Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc.*,
   680 F.2d 573 (9th Cir. 1982) ................................................................................................9

14

15

*Design Furnishings, Inc. v. Zen Path LLC*,
   2010 U.S. Dist. LEXIS 135819 (E.D. Cal. Dec. 23, 2010) ............................................16, 17

16

17

*Dudnikov v. MGA Entm't, Inc.*,
   410 F. Supp. 2d 1010 (D. Colo. 2005)..................................................................................15

18

*Lewis v. Casey*,
   518 U.S. 343 (1996)..............................................................................................................17

19

20

*Lloyd Corp., Limited v. Tanner*,
   407 U.S. 551 (1972)..............................................................................................................17

21

22

*Missouri v. Jenkins*,
   515 U.S. 70 (1995)................................................................................................................17

23

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
   331 F. Supp. 2d 1214 (C.D. Cal. 2004) ...............................................................................12

24

25

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
   414 U.S. 453 (1974)................................................................................................................8

26

27

*Online Policy Group v. Diebold, Inc.*,
   337 F. Supp. 2d 1195 (N.D. Cal. 2004) ...............................................................................14

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*,
    632 F.3d 1111 (9th Cir. 2011) ...................................................................9

*Perfect 10, Inc. v. Megaupload Limited*,
    2011 WL 3203117 (S.D. Cal. July 27, 2011) ...........................................3

*Perry v. Garcia*,
    2010 WL 3633042 (S.D. Cal. July 16, 2010) .........................................18

*Polymer Techs., Inc. v. Bridwell*,
    103 F.3d 970 (9th Cir. 1996) ..................................................................11

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946)..................................................................................9

*Religious Tech. Center v. Wollersheim*,
    796 F.2d 1076 (9th Cir. 1986) ..................................................................9

*Rock River Commc'ns v. Universal Music Group, Inc.*,
    2011 WL 1598916 (C.D. Cal. Apr. 27, 2011) .....................................12, 13

*Rossi v. Motion Picture Ass'n of Am., Inc.*,
    391 F.3d 1000 (9th Cir. 2004) ...............................................2, 14, 15, 16

*Third Educ. Group, Inc. v. Phelps*,
    675 F. Supp. 2d 916 (E.D. Wis. 2009) ...................................................15

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979).............................................................................8, 10

*Williams v. United Airlines, Inc.*,
    500 F.3d 1019 (9th Cir. 2007) ...............................................................10

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................6

*Yeagley v. Wells Fargo & Co.*,
    2006 WL 193257 (N.D. Cal. Jan. 23, 2006).......................................9, 10

**FEDERAL STATUTES AND RULES**

17 U.S.C. § 502(a) ...........................................................................................7

    § 505 ....................................................................................................8

    § 512 ..........................................................................................8, 12, 14

**TABLE OF AUTHORITIES**
(continued)

Page

§ 512(c) ......................................................................................................12, 13

§ 512(c)(3) ....................................................................................................2, 13

§ 512(f) ........................................................................................................passim

§ 512(g)(3) ..........................................................................................................8

§§ 1201 and 1202 ...............................................................................................8

§ 1203 ............................................................................................................7, 8

47 U.S.C. § 14704(a)(1) ........................................................................................9

Fed. R. Civ. P.65(b)(1)(A) .....................................................................................6

U.S. Dist. Ct., N.D. Cal., Civil L.R. 7-10 ...............................................................7

**OTHER AUTHORITIES**

15B Am. Jur. 2d, Computers and the Internet § 215 (2011) .................................8

Andy Greenberg, *The "Mega" Sites: Bigger Than Facebook*, Forbes, Nov. 16, 2009 .............2, 3

H.R. Rep. No. 105-551, pt. 2 (1998) .....................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

The Court can and should deny Megaupload's unauthorized and unnecessary request for a temporary restraining order ("TRO") for at least the following reasons:

- Congress has not granted the federal courts the authority to issue injunctions (either temporary, preliminary or permanent) for alleged violations of 17 U.S.C. § 512(f). The Copyright Act authorizes injunctions for certain offenses—including copyright infringement and violation of the Digital Millennium Copyright Act's anti-circumvention provisions—but *not* for violations of § 512(f). Controlling Supreme Court and Ninth Circuit case law make it clear the Court cannot imply a remedy that Congress did not intend to create.

- Even if Congress had authorized injunctive relief for a § 512(f) violation (which it did not), a restraining order still would be entirely unwarranted because there is no emergency and no irreparable harm. The Video in question is and has been freely available on YouTube both before and after this litigation was filed. In fact, lest there be any doubt about this, YouTube advised UMG Recordings, Inc. ("UMG") that it would restore full access to all instances of the Video on YouTube as of this past Tuesday (as apparently has happened), and UMG has told YouTube that it will take no further action regarding the Video pending the resolution of this litigation. The picture of an emergency that Megaupload tries to create is fiction.[1]

- Megaupload has not come close to showing that it will likely prevail on its § 512(f) claim—the only claim it asserts in this case. Megaupload offers no evidence, only conjecture, that the underlying actions involved a notice sent to YouTube under the DMCA. What actually transpired was UMG's use of YouTube's Content Management System, which UMG is contractually authorized to use pursuant to its written agreement with YouTube. That is a matter of

---

[1] UMG is the company that dealt with YouTube regarding the Video. Megaupload, however, did not sue this company. Instead it sued Universal Music Group, Inc. ("Universal"), which is a holding company and an indirect corporate parent of UMG. Universal did not deal with YouTube regarding the Video. That Megaupload sued—and seeks to enjoin—the wrong company is yet another reason to deny this motion.

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1    contract between two private companies—UMG and YouTube–not a notice sent

2    pursuant to the DMCA, 17 U.S.C. § 512(c)(3)(A).

3    •    Even if this were a case subject to § 512(f), Megaupload's claim still would fail.

4    Under Ninth Circuit law, to prevail under § 512(f), Megaupload must show that

5    UMG (which is the entity that dealt with YouTube) had actual "*subjective, rather*

6    *than objective*" knowledge that it was making a material misrepresentation to

7    YouTube.  *Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1004 (9th

8    Cir. 2004) (emphasis added).  Megaupload *does not even cite* that controlling case,

9    much less show a likelihood of prevailing under that standard.  Megaupload's

10   argument instead is that because *Megaupload* purportedly knew it had clearances

11   from various artists in the Video (notably, Megaupload only submits one of what it

12   claims to be the iron-clad consent agreements), then Universal (actually UMG)

13   could not have acted with "reasonable care or diligence."  Memo. at 11, 12.

14   "Reasonable care or diligence" is a negligence standard; it is not the actual,

15   subjective knowledge standard, which is Circuit law.  Under *Rossi*, Megaupload

16   cannot show a likelihood of success by flipping the standard from what UMG

17   knew to what Megaupload supposedly knew.[2]

18   **II.    FACTUAL BACKGROUND**

19       **A.    Megaupload**

20       Megaupload portrays itself as a mere "provider of online storage and data transmission

21   services."  Memo. at 3.  Megaupload actually is notorious for providing instant access to a wide

22   variety of unauthorized copyrighted content.  A 2009 article in *Forbes* reported that

23   Megaupload.com and its affiliate megavideo.com "offer, at no cost, practically every popular

24   television series episode by episode (*Mad Men*, for example), music albums (such as Jay Z's *The*

25   *Blueprint 3*) and films including several still in theaters, such as *Where the Wild Things Are* and

26   *Zombieland*."  Andy Greenberg, *The "Mega" Sites: Bigger Than Facebook*, Forbes, Nov. 16,

27   _____

28   [2] If Megaupload substitutes in the correct defendant and proceeds to litigate its allegations rather
     than publicize them, UMG will show that Megaupload's 17 U.S.C. § 512(f) claim is meritless.

2009, reprint available at www.forbes.com/forbes/2009/1116/outfront-technology-online-piracy-copyright-megavideo.html.  *See* Klaus Decl., Ex. 1.  Earlier this year, Megaupload and Kim Schmitz—who has changed his name to Kim Dotcom, the declarant on the instant motion—were sued for copyright infringement in the Southern District of California.[3]  *Perfect 10, Inc. v. Megaupload Ltd.*, No. 11-CV-0191 IEG (S.D. Cal.).  As the District Court, in denying Megaupload's motion to dismiss, summarized the allegations of the complaint:

> Defendant Megaupload characterizes itself as a "file storage" company. [*See* Def.'s Mot. at 2.] Megaupload operates various websites, including megaupload.com, megaporn.com, megarotic.com, megavideo.com, and megaclick.com, among others. [Compl. ¶ 22.] Through its websites, Megaupload allows its users to upload files. What's problematic from Perfect 10's perspective is that users frequently upload "pirated" content to Megaupload's servers, which anyone may download with ease. [*See id.*]

> The website Megaupload.com is illustrative. [*See id.*] After a file is uploaded to Megaupload.com, Megaupload creates a unique Uniform Resource Locator ("URL"). [*Id.*] The URL is the address of the file on the internet. [*See id.*] Anyone with the URL can download the file from Megaupload's servers. [*Id.*] Megaupload and its users disseminate URLs for various files throughout the internet. [*Id.*] In order to view, copy, or download such files from the Megaupload websites without waiting, users must pay a membership fee. [*Id.*] It is not clear from Perfect 10's complaint whether Megaupload's other websites work in precisely the same fashion as Megaupload.com. [*See generally* Compl.]

> This much is clear: Megaupload allegedly stores billions of dollars of "pirated" full-length movies, songs, software, and images on its servers. [*Id.* ¶ 22.] Megaupload apparently depends on, and provides substantial payouts to, affiliate websites who catalogue the URLs providing access to the mass of "pirated" content on Megaupload's servers. [*Id.* ¶ 26.] For example, at the affiliate search engine Megaupload.net, users who perform a search are directed to Megaupload's website and offered the opportunity to purchase a membership. [*Id.*]

*Perfect 10, Inc. v. Megaupload Ltd.*, 2011 WL 3203117, at *1-2 (S.D. Cal. July 27, 2011), Klaus Decl., Ex. 2.[4]

---

[3] *Forbes* reported that Dotcom (then Schmitz) originally registered megaupload.com.  *Forbes* further indicated that Dotcom (Schmitz) is "a German hacker who, since the mid-1990s, has been convicted in Germany for computer fraud and, in another case, insider trading.  Megaupload's registration has since been changed to remove Schmitz's name."  Klaus Decl., Ex. 1.

[4] In October of this year, Perfect 10 and Megaupload settled this case.  "[A] key term of the settlement agreement" was a joint request by the parties that the District Court vacate its order denying Megaupload's motion to dismiss.  The court granted that request.  Klaus Decl., Ex. 3.  While the court vacated that Order, the allegations of Megaupload's conduct remain available in

### B.   Background Events Regarding the Video

Megaupload claims that it uploaded the Video to YouTube last Friday, December 9. YouTube is a popular site for displaying video content.  YouTube has an agreement with UMG, the world's largest recorded music company that has contractual relationships with recording artists throughout the world.  UMG is an indirect subsidiary of the defendant in this lawsuit, Universal.  Universal is not a party to UMG's agreement with YouTube.

The UMG-YouTube agreement grants UMG rights to effect the removal of user-posted videos through YouTube's Content Management System ("CMS"), based on a number of contractually specified criteria that are not limited to the infringements of copyrights owned or controlled by UMG.  Klaus Decl., Ex. 4 (Klaus to Kavanaugh letter, Dec. 14, 2011).  Dotcom speculates in his declaration that Universal must have sent a so-called "DMCA notification form," such as the one he printed and attached at Ex. E to his declaration, to YouTube.  Doctcom Decl. ¶ 11.  But UMG (which interacts with YouTube) does not use that form when requesting the removal of material pursuant to UMG's contract with YouTube.  UMG uses YouTube's automated CMS system.

On December 9, UMG utilized YouTube's CMS system to effect the removal of a posting of the Video on YouTube.  While the use of YouTube's CMS system results in the creation of what is called a "reference file"—which in theory is supposed to identify other instances of postings of the same content—the reference file often does not lead to that result.  And, in fact, the Video is and has been on YouTube since last Friday.  *See* Klaus Decl., Ex. 5 (www.youtube.com/watch?v=Y8aUCnyKH2U, identified as posted on Dec. 9, 2011; multiple additional links to the Video listed along the side).

Apparently, within a matter of hours of UMG's use of the YouTube CMS system, Megaupload contacted YouTube to object to the removal of the Video.  Representatives of YouTube and UMG corresponded with each other over the weekend, and by this past Monday evening, a YouTube representative told UMG that YouTube was prepared to release UMG's CMS claims and remove the reference file that the CMS had created for the Video absent further the public record.

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1    information from UMG by noon on Tuesday, December 13.  Klaus Decl., Ex. 4.  In other words,

2    YouTube would continue displaying the Video and remove the reference file blocking other

3    instances of the posting of the Video.  UMG treated YouTube's statements as self-effectuating,

4    and it took no further action to prevent or stop the release of UMG's claims or YouTube's

5    continuing display of the Video.  As UMG's counsel stated in a December 14 letter to YouTube,

6    that will remain UMG's position pending the resolution of this litigation.  *Id.*

7         Megaupload asserts that the removal of *some* instances of the Video posting over the

8    weekend resulted in "the destruction of [its] viral marketing campaign."  Dotcom Decl. ¶ 30.  In

9    fact, Megaupload is using this limited incident and this lawsuit as its viral marketing campaign.

10   Megaupload's counsel posted links to the Complaint and court filings before ever serving them

11   on Universal.  *See* www.techfirm.com (website of the Rothken Law Firm, with Complaint posted

12   on Dec. 12, 2011, a day before Megaupload served Universal).  And Megaupload has publicized

13   its complaint and court filings through numerous publications, including those listed in

14   Megaupload's "Supplemental Statement re: Urgency."  Dkt. Nos. 9 & 10.

15        Relying solely on Dotcom's declaration, Megaupload also claims that Universal has sent

16   takedown notices to "sites other than YouTube."  *See* Dotcom Decl. ¶ 16.  This is unfounded and

17   inaccurate.  Megaupload and Dotcom claim that Universal targeted a news site, *Tech News*

18   *Today*.  *Id.* ¶¶ 19-20.  A careful examination of Dotcom's declaration, however, reveals that the

19   *Tech News Today* file in question in fact was a *YouTube* posting, and thus subject to the reference

20   file created through YouTube's CMS system.  If the reference file hit on the Video embedded in

21   *Tech News Today's* posting—and, if YouTube did nothing to release the reference file on that

22   posting—then the CMS system would have blocked the *Tech News Today* posting.  Dotcom's

23   "*understand[ing] that UMG sent a DMCA takedown notice to YouTube, claiming that Episode*

24   *391 of Tech News Today infringed its copyright* due to its inclusion of portions of the

25   Megaupload Video," *id.* ¶ 20 (emphasis added), is thus unfounded speculation.

26        Dotcom also claims to "understand[] that UMG continued to give notice to other sites,

27   resulting in displacement in numerous locations including Vimeo, Huffington Post, and many

28   others."  Doctcom Dec. ¶ 17.  Doctom's "understanding" rests on a hearsay statement in a

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1  Huffington Post article that the "video has been pulled from Vimeo, *making it seem as if UMG*

2  *has won the most recent round in the back-and-forth war over this video*." *Id.* ¶ 17 & Ex. H

3  (emphasis added).  This is mere speculation on the Huffington Post's part, and in fact, there is no

4  actual evidence that UMG ever sent a takedown notice to Vimeo.com.  Indeed, the Video today is

5  widely available on Vimeo.com.  *See* Klaus Decl., Ex. 5 & http://vimeo.com/33426550;

6  http://vimeo.com/33440289; http://vimeo.com/33425414.  Dotcom's reference to Imgur.com is

7  highly confusing and misleading.  Dotcom Decl. ¶ 18.  Imgur.com claims to be a picture-sharing

8  site, *not* a video site.  *See* http://imgur.com/faq ("Imgur makes sharing images with the Internet

9  easy. It can be used to share pictures with friends, as well as post images on message boards and

10  blogs.").  The Imgur.com page Dotcom identifies shows the *image* of a black box with the

11  statement "This video contains content from UMG, who has blocked in it on copyright grounds."

12  Dotcom Decl., Ex. I (http://imgur.com/DjNAV).  It is unclear whether the page attached to the

13  Dotcom declaration displayed a video displayed on Imgur.com, an in-line link to a video

14  displayed on YouTube (and subject to a reference file), or a picture of a message posted posting

15  elsewhere on the internet.

16      While Megaupload tries to spin Dotcom's speculation, there is no evidence of some

17  campaign by UMG to send takedown notices to multiple websites.

18  **III.    MEGAUPLOAD SEEKS AN EXTRAORDINARY REMEDY**

19      A temporary restraining order is "an extraordinary remedy that may only be awarded upon

20  a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council,*

21  *Inc.*, 555 U.S. 7, 22 (2008).  Federal Rule of Civil Procedure 65(b)(1)(A) permits a restraining

22  order "only if" "specific facts in an affidavit or a verified complaint clearly show that *immediate*

23  *and irreparable injury, loss, or damage* will result to the movant before the adverse party can be

24  heard in opposition."  Fed. R. Civ. P. 65(b)(1)(A) (emphasis added).  Thus, to obtain such an

25  order, Megaupload must show:  (1) a likelihood of success on the merits; (2) a likelihood that it

26  will suffer irreparable harm absent an injunction; (3) that the balance of equities weighs in its

27  favor; and (4) that an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  Megaupload

28  does not come close to establishing any of these elements, much less all of them.

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    MEGAUPLOAD FAILS TO SHOW IT IS ENTITLED TO INJUNCTIVE RELIEF

### A.    17 U.S.C. § 512(f) Does Not Authorize *Ex Parte* Relief or an Injunction

Before even getting to whether Megaupload satisfies the high bar for a restraining order, the Court must confront the question whether Congress has authorized any form of injunctive relief for an alleged violation of 17 U.S.C. § 512(f).  In fact, Congress has not authorized such relief.

This Court's Local Rule 7-10 requires that any *ex parte* motion "*must* include a citation to the statute, rule or order which permits the use of an *ex parte* motion to obtain the relief sought." Civil L.R. 7-10 (emphasis added).  Megaupload's motion nowhere cites the statute, rule or order which permits the relief that it seeks.  The statute that is the sole basis for Megaupload's claim for relief—17 U.S.C. § 512(f)—does not authorize a party to seek an *ex parte* restraining order. Indeed, neither that section of the Copyright Act—nor any other provision in the Act—authorizes an injunction for an alleged violation of that section.

Section 512(f) states in full:

> [a]ny person who knowingly materially misrepresents under this section—  (1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification, *shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer*, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f) (emphasis added).

Section 512(f) thus authorizes *damages*.  Nothing in that section—or any other provision of § 512(f), or anything else in the Copyright Act—says that the Court may issue an injunction for an alleged violation.  This is in marked contrast to the other injunctive relief provisions of the Copyright Act.  Section 502(a) authorizes the Court to issue "temporary and final injunctions"—but only to "*prevent or restrain infringement of a copyright*."  17 U.S.C. § 502(a) (emphasis added).  This is not an action for copyright infringement.  Section 1203 of Title 17—which, along with § 512—is part of the DMCA that Congress enacted in 1998—also injunctions.  But that

1    section authorizes injunctive relief only in a civil action "brought under subsection (a)" of 17

2    U.S.C. § 1203—which in turn authorizes civil actions solely for violations of §§ 1201 and 1202,

3    *i.e.*, the DMCA's anti-circumvention provisions.  This is not an action under §§ 1201 and 1202.

4    When Congress wanted to make a general remedial provision applicable to all alleged violations

5    of Title 17, Congress knew how to do that.[5]  It did not do that here.

6           Further proof that Congress did not intend to authorize an injunction for an alleged

7    § 512(f) violation is found in the structure that Congress created for notices and takedowns

8    subject to § 512.  Section 512 provides a counter-notification and "put-back" mechanism, to be

9    utilized by a party who believes that a DMCA takedown notice was erroneously issued.  17

10   U.S.C. § 512(g)(3).  In other words, Congress created its own informal resolution process in order

11   to avoid litigation, not create it.  As recounted in the legislative history, "[t]he put-back

12   procedures were added to balance the incentives created in new Section 512 for service providers

13   to take down material against third parties' interests in ensuring that material not be taken down."

14   H.R. Rep. No. 105-551, pt. 2, at 59 (1998).  The "put-back" procedure, combined with the

15   absence of any grant of authority to issue an injunction for an alleged § 512(f) violation, confirms

16   that Congress did not intend to vest courts with injunctive power to restrain claims of knowingly

17   false DMCA takedown notifications.  *See* 15B Am. Jur. 2d, Computers and the Internet § 215

18   (2011) ("An injunction is not allowed on a claim that a competitor knowingly materially

19   misrepresented the fact that the plaintiff's website was infringing when the competitor filed its

20   notices, since the applicable statute only provides for damages and does not mention injunctive

21   relief.").

22          The Supreme Court has made it clear that "it is an elemental canon of statutory

23   construction that where a statute expressly provides a particular remedy or remedies, a court must

24   be chary of reading others into it."  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11,

25   19–20 (1979).  *See also Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S.

26   453, 458 (1974) ("A frequently stated principle of statutory construction is that when legislation

27   ───────────────────────

28   [5] *See* 17 U.S.C. § 505 (giving court discretion to award attorney's fees to prevailing party in "*any* civil action under this title") (emphasis added).

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1    expressly provides a particular remedy or remedies, courts should not expand the coverage of the

2    statute to subsume other remedies.").  The Ninth Circuit recently adhered to this principle in

3    *Owner-Operator Independent Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 632 F.3d 1111 (9th

4    Cir. 2011).  There, the court held that 47 U.S.C. § 14704(a)(1), which only authorizes injunctive

5    relief for violations of the federal Truth–in–Leasing regulations, *see id*. at 1121 (a "person may

6    bring a civil action for injunctive relief . . . "), did "not permit[]" the plaintiffs to seek "restitution

7    and disgorgement" under the statute.  632 F.3d at 1121.  The Ninth Circuit *rejected* the plaintiffs'

8    argument that under *Porter v. Warner Holding Co*., 328 U.S. 395, 398 (1946), "courts always

9    retain their full equitable powers unless a statute expressly removes them."  *Owner-Operator*, 632

10   F.3d at 1121.  The court noted that "*Porter* and its progeny contain the caveat that 'unless

11   otherwise provided by statute,' the court retains its full equitable powers. . . . In this case, by

12   contrast, the statute has done precisely that; it has provided a different scheme of enforcement,

13   listing only injunctive relief to the exclusion of other equitable remedies." *Id*.[6]  This "reading of

14   the statute" was "the most sensible in light of longstanding case law and principles of statutory

15   interpretation." *Id*.  Similarly, in *Religious Technology Center v. Wollersheim*, 796 F.2d 1076

16   (9th Cir. 1986), the Ninth Circuit held that injunctive relief was not available under civil RICO

17   where the statute did not expressly provide so.  The court stated that "[w]here a statute provides

18   an elaborate enforcement scheme," it "'cannot be assumed that Congress intended to authorize by

19   implication additional judicial remedies for private citizens.' . . . .  In the absence of strong indicia

20   of a contrary congressional intent, we are compelled to conclude that Congress provided precisely

21   the remedies it considered appropriate." *Id*. at 1088.  Thus, "[e]ven so, while, on balance, it may

22   well have been desirable for Congress to have extended to private parties the right to injunctive

23   relief under civil RICO, we are convinced that Congress chose not to do so, and we must respect

24   and follow that judgment." *Id*. at 1089.  *See also Yeagley v. Wells Fargo & Co*., 2006 WL

25   193257, at *2 (N.D. Cal. Jan. 23, 2006) (Breyer, J.) ("By limiting the remedies for private right of

---

26   [6] *Owner-Operator*, 632 F.3d at 1121 (citing, e.g., *Porter*, 328 U.S. at 398–99 (construing a statute
     giving the district court power, "upon a proper showing, to grant 'a permanent or temporary

27   injunction, restraining order, *or other order*'" (emphasis added)); *Commodity Futures Trading
     Comm'n v. Co Petro Mktg. Group, Inc*., 680 F.2d 573, 583-84 (9th Cir. 1982) (construing a

28   statute with open-ended language conferring powers).

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1   actions to damages and attorneys' fees [in the Fair Credit Reporting Act] Congress demonstrated

2   that it did not intend for private litigants to obtain injunctive or declaratory relief" under that

3   statute (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)). [7]

4          Megaupload cites two cases for the proposition that a court may issue an injunction under

5   § 512(f), but neither decision confronts the foregoing authorities.  *Biosafe-One, Inc. v. Hawks*,

6   524 F. Supp. 2d 452 (S.D.N.Y. 2007) (this is not a Northern District of California case, as

7   Megaupload's citation suggests it is, *see* Memo. at 8:9), recognizes that § 512(f) "specifically

8   provides for the remedy of damages and makes no mention of injunctive relief[,]" 524 F. Supp.

9   2d at 469, but nevertheless granted an injunction, without dealing with the foregoing authorities.

10  Megaupload also cites *Amaretto Ranch Breedables v. Ozimals, Inc.*, 2010 WL 5387774 (N.D.

11  Cal. Dec. 21, 2010) (Breyer, J.), but that case, too, does not deal with the controlling case law

12  regarding the courts' injunctive relief powers; the court simply assumed that an injunction was

13  available.  As Judge Breyer recognized in *Yeagley*, cases that do "not discuss the language and

14  structure" of the statute, or that simply assume equitable relief is available, are "not persuasive" in

15  the face of the Supreme Court and Ninth Circuit authorities discussed above.  2006 WL 193257,

16  at *3.

17         In short, Congress did not grant the Court the authority to issue the injunctive relief that

18  Megaupload requests.  The motion can and should be denied for that reason alone.

19

20

21  _____

[7] *See also, e.g., City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1007-08 (9th
22  Cir. 2010) ("'[I]t is an elemental canon of statutory construction that where a statute expressly
    provides a particular remedy or remedies, a court must be chary of reading others into it.' . . . . In
23  section 113(g)(2), Congress specified a mechanism whereby a declaration of liability for costs
    already incurred has preclusive effect in future proceedings as to costs yet to be incurred. If
24  Congress had intended for a declaration of future liability to be available, it could have provided
    that 'the court shall enter a declaratory judgment on liability for further response costs.' That it
25  did not leads us to conclude that declaratory relief is available only if liability for past costs has
    been established under section 107."); *Williams v. United Airlines, Inc.*, 500 F.3d 1019, 1024 (9th
26  Cir. 2007) ("Congress established a carefully-tailored administrative scheme in the WPP and
    provided exclusive judicial review of the Secretary's order in the courts of appeal. . . .  The
27  explicit provision of these elaborate enforcement mechanisms strongly undermines the suggestion
    that Congress also intended to create by implication a private right of action in a federal district
28  court but declined to say so expressly.").

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1

**B.      Megaupload Does Not and Cannot Demonstrate Immediate and Irreparable Injury**

2

3            Even if the Court had the authority to issue an injunction, Megaupload's motion still

4    would fail on the merits.  First and foremost, Megaupload has not satisfied the critical element of

5    showing that it will suffer immediate and irreparable harm.  The analysis of this element starts

6    and ends with an indisputable fact that Megaupload inexplicably omits from its papers; namely,

7    that the Video is widely available on YouTube and other Internet sites.[8]  YouTube made it very

8    clear to UMG that it would reject UMG's claim and restore all URLs to the Video as of this past

9    Tuesday at Noon pacific.  Klaus Decl., Ex. 4.  UMG did not object.  In fact, as UMG stated in its

10   December 14, 2011 letter to YouTube, UMG has not stopped and will not stop YouTube from

     restoring access to all URLs for the Video pending the resolution of this litigation.  *Id.*

11           In short, there is no threat, imminent or otherwise, that UMG, which dealt with YouTube

12   (or, for that matter, Universal, which did not deal with YouTube, but for some reason wound up

13   named as the defendant in this case) will take any action to remove or prevent the restoration of

14   the Video pending a full airing and disposition of the issues in this case.  Because the need for

15   extraordinary relief that Megaupload seeks is simply non-existent, the request for a injunctive

16   relief should be denied.  *See, e.g., Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir.

17   1996) (no "irreparable harm" where "the non-movant has or will soon cease the allegedly

18   infringing activities"); *Cramer v. Target Corp.*, 2010 WL 2232400, at *5 (E.D. Cal. June 3, 2010)

19   (denying motion for preliminary injunction where "all Target surveillance videotapes relevant to

20   Plaintiff's incident have apparently been provided to Plaintiff, thereby rendering his request for

21   the videotapes moot"; Plaintiff "has not established that any documents or videos are at risk of

22   _____

23   [8] *See, e.g.,* http://www.youtube.com/watch?v=Y8aUCnyKH2U;
     http://www.youtube.com/watch?v=lki9CVQtKTc&feature=related;
     http://www.youtube.com/watch?v=tK63F97f9_g&feature=related;
24   http://www.youtube.com/watch?v=7kUaO0OYC4c&feature=related;
     http://www.youtube.com/watch?v=tGbz39ET4Os&feature=related;
25   http://www.youtube.com/watch?v=eJ7LTwYL_oY&feature=related;
     http://www.youtube.com/watch?v=pCkI5I8vsBg&feature=related;
26   http://www.youtube.com/watch?v=pdogCHmquUs&feature=related;
     http://www.youtube.com/watch?v=JYZzxR4I2nI&feature=related;
27   http://www.youtube.com/watch?v=ItWwu8loiUA&feature=related;
     http://www.youtube.com/watch?v=CaLZxinmU5c; http://vimeo.com/33426550;
28   http://vimeo.com/33440289; http://vimeo.com/33425414 (all visited Dec. 15, 2011).

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

being destroyed and he would suffer irreparable harm in the absence of an injunction"); *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1223 n.3 (C.D. Cal. 2004) ("immediately after receiving Plaintiffs' cease and desist letter (and before Plaintiffs filed suit), Abercrombie voluntarily discontinued those sweatshirts.  Plaintiffs do not contend that it is likely that Abercrombie intends, or is likely to sell, garments bearing the words 'Moose Creek' in the future. Therefore, Plaintiffs' motion for a preliminary injunction, to the extent that it seeks to enjoin Abercrombie from marketing or selling garments bearing the words 'Moose Creek,' is moot.").

C. **Megaupload Has Not Established a Likelihood of Success (or Even Serious Questions) on the Merits**

Megaupload has not demonstrated a likelihood of success on the merits, or even serious questions going to the merits, for two separate reasons.  First, Megaupload has not demonstrated that the purported "notice" at issue was even subject to § 512(f).  Second, Megaupload has misstated the governing "good faith" standard for § 512(f), and has not alleged, much less established, any facts triggering liability under the provision.

1. **Megaupload Has Not Established That UMG Sent a "Takedown Notice" to YouTube Under the DMCA**

For there to be liability under § 512(f), the "notice" at issue must be one that is sent "under this section," *i.e.*, under 17 U.S.C. § 512.  To be such a takedown notice, a number of requirements of § 512(c) must be satisfied.  Absent a notification under § 512(c) of the DMCA, "no claim under section 512(f) can stand."  *Rock River Commc'ns v. Universal Music Group, Inc.*, 2011 WL 1598916, at *16 (C.D. Cal. Apr. 27, 2011).  The requirements for a notice under § 512(c) include, *inter alia*,

a "physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed";

the "[i]dentification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site";

the "[i]dentification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be

disabled, and information reasonably sufficient to permit the service provider to locate the material";

a "statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law"; and

a "statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed."

17 U.S.C. § 512(c)(3).

Megaupload does not submit evidence of any notice being sent pursuant to the DMCA. Instead, Mr. Dotcom says that "it is my understanding that . . . UMG [by which he means Universal] affirmed, under penalty of perjury (pursuant to Section 512(c)(3) of the DMCA), that it is authorized to act on behalf of the owner of the copyright in the Megaupload Video." Dotcom Decl. ¶ 11. Mr. Dotcom does not say from whom or from what he gets this "understanding." He instead attaches to his declaration—at Exhibit E—a generic "copyright complaint form" that any copyright owner can send to YouTube to complain about copyright infringement.

UMG, however, did not send YouTube the copyright infringement complaint form. As discussed, pursuant to the UMG-YouTube agreement, UMG has the right to block or remove user-posted videos through YouTube's CMS based on a number of contractually specified criteria. *See* Klaus Decl., Ex. 4. That is not a "take-down letter as described in section 512(c)." *Rock River Commc'ns*, 2011 WL 1598916, at *16. Megaupload's failure to show that the DMCA even applies to UMG's dealings with YouTube means that Megaupload has failed to show a likelihood of success on the merits.

> ### 2. Megaupload Misstates the Governing "Good Faith" Standard Under Section 512(f) and Has Not Pled, Much Less Demonstrated, Facts Establishing Liability

Megaupload also fails to establish a likelihood of meeting the substantive requirements of § 512(f), even if that section applied (which it does not). Section 512(f) provides that "[a]ny person who *knowingly materially misrepresents* . . . that material or activity is infringing . . . shall be liable for any damages . . . incurred by the alleged infringer . . . ." 17 U.S.C. § 512(f)

1    (emphasis added).  In arguing that it has shown a likely success that Universal (really, UMG)

2    violated this provision, Megaupload relies repeatedly on *Online Policy Group v. Diebold, Inc.,*

3    337 F. Supp. 2d 1195 (N.D. Cal. 2004).  *See* Memo. at 9, 11, 13-14.  In particular, Megaupload

4    relies on *Diebold* for the proposition that "a party 'knowingly' misrepresents that material is

5    infringing if it 'actually knew, should have known if it acted with reasonable care or diligence, or

6    would have had no substantial doubt had it been acting in good faith, that it was making

7    misrepresentations." Memo. at 11 (quoting *Diebold*, 337 F. Supp. 2d at 1204).  Megaupload then

8    asserts that, "*[r]easonable care or diligence* includes, at the very least, a review of the allegedly

9    infringing material and assessment of its content." *Id.* (emphasis added).

10            Megaupload's argument suffers from a major flaw:  *Diebold* is not the law of the Ninth

11   Circuit and does *not* set the standard for actionable knowledge under the DMCA.  *Rossi v. Motion*

12   *Picture Association of America Inc*., 391 F.3d 1000 (9th Cir. 2004)—which was decided by the

13   Ninth Circuit, decided after *Diebold*, and inexplicably not cited in Megaupload's application—is

14   Ninth Circuit law.  That case expressly holds that the "interpretive case law and the statutory

15   structure" of the DMCA "support the conclusion that the 'good faith belief' requirement . . .

16   *encompasses a subjective, rather than objective, standard*." *Id*. at 1004 (emphasis added).  The

17   Ninth Circuit flatly rejected the imposition of the "reasonable care or diligence" standard

18   Megaupload advances here:

19           Juxtaposing the "good faith" proviso of the DMCA with the "knowing
20           misrepresentation" provision of that same statute [Section 512(f)] reveals an
             apparent statutory structure that predicated the imposition of liability upon
21           copyright owners only for knowing misrepresentations regarding allegedly
             infringing websites.  Measuring compliance with a lesser 'objective
22           reasonableness' standard *would be inconsistent with Congress's apparent intent
             that the statute protect potential violators from subjectively improper actions by
23           copyright owners*.

24   *Id*. at 1005 (emphasis added).

25           In *Rossi*, the Ninth Circuit held it was irrelevant that the noticing party there (the MPAA)

26   "did not attempt to download any movies from [the alleged infringer's] website or any links to the

27   site," and that if the "MPAA had reasonably investigated the site by attempting to download

28

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1  movies, it would have been apparent that no movies could actually be downloaded from [the]

2  website or related links." *Id*. at 1003. The court rejected this argument as an improper attempt to

3  impose an "objective standard of review for gauging the reasonableness" of a copyright owner's

4  "conduct in notifying" parties of an "allegedly infringing website." *Id*. at 1004. As the court

5  stressed, a copyright owner cannot be liable under Section 512(f) "*even if the copyright owner*

6  *acted unreasonably in making the mistake*. *See* § 512(f). Rather, there must be a demonstration

7  of *some actual knowledge of misrepresentation* on the part of the copyright owner." *Id*. at 1005

8  (emphases added).

9        Numerous other courts have followed *Rossi* and held that it is irrelevant under Section

10  512(f) whether the defendant acted objectively unreasonably in sending a takedown notice. In

11  *Cabell v. Zimmerman*, 2010 WL 996007, at *4-5 (S.D.N.Y. Mar. 12, 2010), the plaintiff argued

12  that the defendant "did not 'perform the proper due diligence to back up its claim that Plaintiff

13  was a copyright infringer' before sending a takedown notice to YouTube." *Id*. at *4. The court

14  rejected this argument, holding that the argument that "Defendant *should have known the real*

15  *facts*" is irrelevant because "negligence is *not the standard for liability under section 512(f)*." *Id*.

16  (emphases added). *See also Dudnikov v. MGA Entm't, Inc*., 410 F. Supp. 2d 1010, 1017 (D.

17  Colo. 2005) ("plaintiffs' attack of the 'reasonableness' of MGA's good faith belief on the

18  ground" that Senior Counsel for MGA "'*knew better*' than to conclude that" the work "was

19  infringing MGA's rights" was irrelevant (emphasis added)).

20        Megaupload's conclusory assertions that Universal "knew *or should have known* it had no

21  exclusive right to any material in the Megaupload Video," and that Universal did not act with

22  "*reasonable care or diligence*," Memo. at 11:21-22, 12:14-15 (emphasis added) (quotations

23  omitted), fail to satisfy *Rossi*. "[T]here must be a demonstration of some actual knowledge of

24  misrepresentation on the part of the copyright owner." *Rossi*, 391 F.3d at 1005. *See Third Educ.*

25  *Group, Inc. v. Phelps*, 675 F. Supp. 2d 916, 927 (E.D. Wis. 2009) (following *Rossi* and noting

26  that "[t]here is absolutely no evidence to suggest that Phelps acted without subjective good faith

27  when he brought his claim under the DMCA. Therefore, as to the claim of misrepresentation, it

28  shall be dismissed and judgment shall be entered to that affect in favor of Phelps.").

DEF'S OPP. TO *EX PARTE* APP. FOR TRO
CASE NO. C-11-6216 CW

1   Megaupload does not offer *any* evidence—or even allege any pertinent facts—showing
2   that UMG acted in subjective bad faith.  Megaupload insists that Universal (really, UMG)
3   "should have known" it did not own the Video because Megaupload "created the video out of
4   completely new and original content" and "obtained signed agreements from all the artists and
5   other celebrities appearing in it," which purportedly state that "*all* intellectual property rights in
6   the video were owned by Megaupload."  Memo. at 1.  *See also id*. at 11-12 (stating that the "song
7   contained in the Megaupload Video is an original composition, and the video was created to
8   feature it," and that the UMG artists who "appear in the work," such as will.i.am, "released all
9   rights.").  Megaupload offers no evidence or allegation that UMG was even aware of any of these
10  purported releases, or that UMG believed any such releases to be valid, when UMG contacted
11  YouTube.  Indeed, Megaupload does not offer any evidence showing that it knows anything
12  about UMG's subjective knowledge.  Megaupload's claim instead is that, because Megaupload
13  supposedly knew it had valid releases, UMG should have known the same thing.  That contention
14  ignores *Rossi*; it is entirely circular; and it fails to demonstrate a likelihood of success on the
15  merits, all further dooming Megaupload's claim to injunctive relief.

16          **D.      The Remaining Equitable Factors Weigh Against Injunctive Relief**

17          The remaining factors required to obtain a restraining order likewise fail to support
18  Megaupload's request for extraordinary *ex parte* relief (or, indeed, any relief at all).  No equities
19  weigh in Megaupload's favor.  The Video is and has been widely available.  YouTube already has
20  told UMG that it is withdrawing the reference file for the Video, and UMG has made it clear that
21  it will not take further action regarding the Video pending the conclusion of this dispute.
22  Megaupload's bemoaning of the purported "torpedo[ing of] Megaupload's main marketing
23  tool[,]" Memo. at 16:9, is rhetoric rather than reality.  The facts here bear no resemblance to
24  Megaupload's showpiece case on the equities, *Design Furnishings, Inc. v. Zen Path LLC*, 2010
25  U.S. Dist. LEXIS 135819 (E.D. Cal. Dec. 23, 2010).  That case not only involved notices
26  indisputably subject to § 512(f), *id*. at *13 n.9, it involved notices to the online auction site, eBay,
27  where the plaintiff sold its furniture.  The removal of plaintiff's auction site meant the removal of
28  an actual sale site, not simply one instance of an advertisement still widely available.  *Id*. at *23.

For similar reasons, Megaupload's arguments that the public interest favors the entry of an injunction are without merit. Megaupload's repeated appeals to the First Amendment and the supposed "trampl[ing of] Megaupload's rights of free speech," Memo. at 16:9-10, 19:2, are a red herring. *See Lloyd Corp., Limited v. Tanner*, 407 U.S. 551, 567 (1972) ("the First and Fourteenth Amendments safeguard the rights of free speech . . . by limitations on state action."). Universal (and UMG, for that matter) is a private entity, not a state actor. While YouTube and Google have millions and millions of users (just as Megaupload claims it does), they obviously are not the government, either.

**E.      The Injunction That Megaupload Requests Improperly Goes Far Beyond the Scope of Its Claims**

Even if § 512(f) authorized injunctions, and even if Megaupload introduced evidence to show that it was entitled to an injunction for an alleged violation of that provision (neither of which is true), the injunction that Megaupload requests at page 1 of its application goes far beyond the specific allegations of this case. Megaupload, for example, seeks to prohibit UMG from "making any further misrepresentations regarding UMG's purported ownership of online content that it does not in fact own," without *any limitation* even to the Video at issue in this case. App. at 1. Moreover, Megaupload broadly seeks to prohibit UMG from "attempting to bar the distribution, hosting, linking, licensing, performance, or display of the Megaupload Video, in whole or in part." *Id.* at 1. At most, § 512(f) would bar the issuance of DMCA takedown notices issued with respect to the Video. It would not, however, extend to any of the additional conduct Megaupload seeks to enjoin.

As the Supreme Court has made clear, an injunctive "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). *See also Missouri v. Jenkins*, 515 U.S. 70, 88-89 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation" (citation and internal quotation marks omitted)). Megaupload's § 512(f) claim solely concerns UMG's purported issuance of a takedown notice containing a material misrepresentation as to the Video. That claim does not extend to any "misrepresentations regarding UMG's purported

1   ownership of online content" or UMG's other actions to prevent "the distribution, hosting,

2   linking, licensing, performance, or display of the Megaupload Video."  App. at 1.  Because the

3   "Court does not have jurisdiction to issue wide-reaching injunctions that extend beyond any

4   actual injury suffered by a plaintiff" as a result of the alleged illegality, the Court should deny

5   Megaupload's application.  *Perry v. Garcia*, 2010 WL 3633042, at \*14 (S.D. Cal. July 16, 2010).

6   **V.      CONCLUSION**

7          For the foregoing reasons, we respectfully submit the Court should deny Megaupload's

8   application.

9

10  DATED: December 15, 2011                    MUNGER, TOLLES & OLSON LLP

11

12                                              By:_____*/s/ Kelly M. Klaus*_____
                                                        KELLY M. KLAUS

13                                              Attorneys for Defendant
14                                              UNIVERSAL MUSIC GROUP, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28