IRA P. ROTHKEN (CSB No. 160029)
ira@techfirm.com
JARED P. SMITH (CSB No. 130343)
jared@techfirm.com
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: 415.924-4250
Facsimile: 415.924-2905

LAURENCE F. PULGRAM (CSB No. 115163)
lpulgram@fenwick.com
JENNIFER L. KELLY (CSB No. 193416)
jkelly@fenwick.com
LIWEN A. MAH (CSB No. 239033)
lmah@fenwick.com
ERIN SIMON (CSB No. 268929)
esimon@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile: 415.281.1350

Attorneys for Plaintiff
MEGAUPLOAD LTD.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

MEGAUPLOAD LTD.,

Plaintiff,

v.

UNIVERSAL MUSIC GROUP, INC. and DOES 1 to 100, inclusive,

Defendants.

Case No. CV-116216-CW

**REPLY MEMORANDUM IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Date: TBD
Time: TBD
Dept: Courtroom 2 – 4th Floor
Judge: The Hon. Claudia Wilken

Action Filed: December 12, 2011

# TABLE OF CONTENTS


**Page**

INTRODUCTION ........ 1

ARGUMENT ........ 3

**I.** UMG'S CONCESSIONS AND OMISSIONS. ........ 3

**II.** PRELIMINARY RELIEF REMAINS POTENTIALLY WARRANTED BASED ON FACTS EXCLUSIVELY WITHIN UMG'S POSSESSION, AS TO WHICH DISCOVERY IS APPROPRIATE ........ 4

**III.** RELIEF IN THE FORM OF A PRELIMINARY INJUNCTION IS AVAILABLE ........ 6

A. Injunctive Relief is Available for Violations of Section 512(f) ........ 6

B. Injunctions Are Also Available Under the Declaratory Judgment Act ........ 9

**IV.** GOOD CAUSE EXISTS FOR EXPEDITED DISCOVERY IN LIGHT OF THE PRELIMINARY INJUNCTIVE RELIEF SOUGHT. ........ 10

CONCLUSION ........ 13


FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amaretto Ranch Breedables v. Ozimals, Inc.*,
2010 WL 5387774 (N.D. Cal. Dec. 21, 2010) (Breyer, J.) ..... 10

*Biosafe-One, Inc. v. Hawks*,
524 F. Supp. 2d 452 (S.D.N.Y. 2007) ..... 10

*Bucciarelli-Tieger v. Victory Records*,
2007 U.S. Dist. LEXIS 39634 (N.D. Ill. May 17, 2007) ..... 11

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ..... 8

*City of Colton v. Am. Promotional Events, Inc.-West*,
614 F.3d 998 (9th Cir. 2010) ..... 10

*Ellsworth Assocs. v. United States*,
917 F. Supp. 841 (D.D.C. 1996) ..... 11

*In re Mullins*,
125 B.R. 808 (E.D. Cal. 1990) ..... 6

*Lenz v. Universal Music Corp.*,
572 F. Supp. 2d 1150 (N.D. Cal. 2008) ..... 9

*McKann v. Kerner*,
436 F. 2d 1342 (7th Cir. 1971) ..... 10

*Nabisco, Inc. v. PF Brands, Inc.*,
50 F. Supp. 2d 188 (S.D. N.Y. 1999), *aff'd*, 191 F.3d 208 (2d Cir. 1999) ..... 11

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
414 U.S. 453 (1974) ..... 9

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*,
632 F.3d 1111 (9th Cir. 2011) ..... 9

*Pod-Ners, LLC v. Northern Feed & Bean*,
204 F.R.D. 675 (D. Colo. 2002) ..... 11

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946) ..... 8

*Powell v. McCormack*,
395 U.S. 486 (1969) ..... 10

*Reebok Int'l v. Marnatech Enters.*,
970 F.2d 552 (9th Cir. 1992) ..... 8

*Religious Tech. Center. v. Wollersheim*,
796 F.2d 1076 (9th Cir. 1986) ..... 9

*Rincon Band of Mission Indians v. Harris*,
618 F. 2d 569 (9th Cir. 1980)........................................................................................ 10

*River Rock Commc'ns v. Universal Music Grp., Inc.*,
2011 WL 1598916 (C.D.Cal. Apr. 27, 2011) ................................................................. 6

*Rossi v. Motion Picture Ass'n of Am.*,
391 F.3d 1000 (2004)........................................................................................................ 4

*Semitool v. Tokyo Electron Am., Inc.*,
208 F.R.D. 273 (N.D. Cal. 2002).................................................................................... 11

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979)............................................................................................................ 9

*United States v. Alabama*,
2006 U.S. Dist. LEXIS 37888 (M.D. Ala. June 7, 2006) ............................................... 11

*Weinberger v. Romero–Barcelo*,
456 U.S. 305 (1982).......................................................................................................... 8

*Williams v. United Airlines, Inc.*,
500 F.3d 1019 (9th Cir. 2007)......................................................................................... 10

*Yeagley v. Wells Fargo & Co.*,
2006 WL 193257 (N.D. Cal. Jan. 23, 2006) ............................................................... 9, 10

**STATUTES**

17 U.S.C. § 512.................................................................................................... *passim*

22 U.S.C. § 2201 *et seq*.......................................................................................... 10

28 U.S.C. § 2202...................................................................................................... 10

sections of the Copyright Act.................................................................................... 8

**RULES**

Civ. L.R. 7-10 ............................................................................................................ 7

Fed. R. Civ. P. 65 ....................................................................................................... 7

Fed. R. Evid. Rule 1002 ............................................................................................. 6

Rules 26(d), 30(a), and 34(b) of the Federal Rules of Civil Procedure ...................... 11

Rule 26(d) ................................................................................................................ 11

**OTHER AUTHORITIES**

Schwarzer et al., *Federal Civil Procedure Before Trial, Cal. & 9th Cir. ed.* (The Rutter
Group 2011) ¶ 13:22 ................................................................................................... 8

**INTRODUCTION**

Defendant UMG's Opposition to the Temporary Restraining Order ("Opp.") reports to the Court that UMG no longer objects to Megaupload's posting of the Megaupload Video on YouTube. Specifically, after receiving oral notice of this *ex parte* application on December 13, 2011, after the *ex parte* was filed and served early on December 14, 2011, and after receiving a letter from YouTube that same date stating that YouTube would repost the file if UMG did not provide proof of its previously asserted copyright interest by December 15, 2011 (Klaus Decl. Exh. 4, at 1), UMG relented. It represented to YouTube that it would not make any effort to prove its ownership. *Id.* It acceded to YouTube's restoration of the video, telling YouTube that this would remain its position for the duration of the litigation. *Id.* at 2. As UMG represented to this Court, UMG "will not stop YouTube from restoring access to all URLs for the Video pending the resolution of this litigation." Opp. at 11. UMG's Opposition also makes no continued pretense that it has any copyright interest in the Megaupload Video. It makes no effort to justify its prior takedown notices whatsoever.

Based on UMG's concession—which it never disclosed to Megaupload or the Court until its filing at 4:53 p.m. on December 15, 2011—Megaupload has now won the principal provisional relief it sought. For that reason, Megaupload agrees with UMG that the request for interim relief is now moot—in part. Specifically, UMG has capitulated on the wrongful takedown of the copy of the video posted by Megaupload itself on one site, YouTube. That posting was the principal motivation, and the factual underpinning, for the request for an *ex parte* TRO. Accepting UMG at its word, no further TRO needs to be issued prior to hearing on a preliminary injunction.

However, serious issues require interim relief as to UMG's wrongful takedown of *other* copies of the Megaupload Video virally spread by others to locations across the Internet. As discussed below, the evidence suggests that UMG issued notices causing improper takedowns at locations like Vimeo and imgur, among others. UMG has declined to tell the Court whether or not it sent takedown notices to those entities, or others. Indeed, UMG has declined to put in any testimony from anyone involved in the takedowns. It has failed to disclose what notices it sent, to whom, whether they were rescinded, or why it thought it could send them. Instead, without

denying sending multiple takedown notices, UMG claims that this is just "speculation" and that there is "no evidence" that it did so. Opp. at 6.

The evidence, of course, is completely in UMG's control. Megaupload does not receive notices when UMG blocks viral postings by others of Megaupload's works. Dotcom Decl. ¶ 26. Thus, while UMG rests its defense on lack of evidence that it submitted takedown notices other than to YouTube, the truth is in its hands. So is the evidence of whether or not UMG has uniformly—as it did with YouTube—dropped its claims to owning the Megaupload Video. UMG has submitted no assurance mooting the need for a Court order restoring the copies that virally spread across the Internet, which will otherwise continue to display dead links and false allegations of infringement against Megaupload. *See, e.g., id.*, Exh. I.

In addition, although the original YouTube video was restored yesterday, UMG's false claim of ownership is still interfering with the video's display. YouTube has reported to Megaupload that "because the video has been claimed by a copyright owner, its statistics cannot be made public." Supplemental Declaration of Kim Dotcom, Exh. A. Not publicizing the number of views of the video precludes it from rising to its true rank on YouTube, most likely at or near the top of "most watched" lists. *Id.* ¶ 3. Why this harm is continuing needs to be understood immediately. UMG is now claiming that it has a private, automated censorship right— supported by a secret process that can takedown any YouTube video with immunity from the DMCA—and there is nothing that this Court could do about it. UMG's actions and their continuing harm implicate important speech suppression issues, warranting immediate and narrow discovery to test the integrity of UMG's argument, and the extent of its continued interference with the full and fair display of the video, in preparation for the preliminary injunction hearing.

For these reasons, Megaupload respectfully suggests that, although the TRO has been resolved, (i) the Court should enter the OSC, (ii) the Court should approve limited expedited discovery; and (iii) the Court should set a briefing schedule for the preliminary injunction, including supplemental moving papers by Megaupload, for after UMG provides the facts as to the takedown notices it has sent and its CMS agreements for deleting material from YouTube.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**ARGUMENT**

**I. UMG'S CONCESSIONS AND OMISSIONS.**

In addition to conceding that the original Megaupload Video posted on YouTube may be restored, UMG's Opposition is remarkable for conceding, and providing no evidence on, numerous other key issues relevant to proceeding with an OSC:

- UMG makes no effort to defend any claim to ownership in the Megaupload Video.
  - It tacitly concedes that the work was 100% created by Megaupload.
- UMG does not dispute that the original video uploaded to YouTube, and linked to by Twitter feeds, was taken down and unavailable until December 15. Supp. Dotcom Decl. Exh. A.
  - Although UMG lists a number of examples that it claims show that, on December 15, the video "is widely available" on YouTube (Opp. at 11 n.8), significantly, the original video, number K9caPfPQUNs (Dotcom Decl., Exh. N), was *not* among them.
  - As of this brief, it appears that the original video has now gone back up—but almost a week after the initial takedown, and with its statistics still not being disclosed. *See* Dotcom Decl. ¶ 11.
- UMG provides no explanation of any good faith basis for taking down the video.
  - Although it argues that the legal standard for knowledge is subjective,[1] UMG ignores Megaupload's explanation that UMG could have had no possible good faith, subjective belief that it owned copyrights in a video that copiously praised a business UMG claims promotes "pirated" content. *See* TRO App. at 11:21-12:11; Opp. at 3.
- UMG provides no testimony from *anyone* as to what notices it sent to YouTube or to others.
  - In its brief, UMG obliquely asserts that it began the takedown process by

---

[1]Contrary to UMG's assertion, *Rossi v. Motion Picture Ass'n of Am.*, 391 F.3d 1000 (2004), is not controlling here. There was no claim in that case for "knowing misrepresentation" under Section 512(f). It dealt with the standard for a "good faith belief" under § 512(c)(3)(A)(v), which requires copyright holders to certify in each takedown notice that they have a good faith belief that the challenged material is not authorized by the copyright owner or the law. The court's references to the § 512(f) standard of knowing misrepresentations are dicta. Further, that case did not address the good reasons to provide a lower, subjective standard upon which a service provider is required to take down a file (§ 512(c)(3)(A)), while holding the party giving notice to a higher, objective standard when accused of causing injury by misrepresentations (under § 512(f)). In any event, UMG has failed to articulate *any* motivation for demanding removal of the Megaupload Video, much less a good faith reason.

sending a notice through YouTube's Content Management System ("CMS"). But it does not provide the contract governing that process, a copy of the submission, or any explanation of what it represented to YouTube during the days of back and forth in which UMG persisted in keeping the video off line.

- Finally, UMG makes no claim that it would be harmed in any manner by issuance of interim relief, or that any balance of hardships tips in its favor.

## II. PRELIMINARY RELIEF REMAINS POTENTIALLY WARRANTED BASED ON FACTS EXCLUSIVELY WITHIN UMG'S POSSESSION, AS TO WHICH DISCOVERY IS APPROPRIATE.

The record reflects that the Megaupload Video was disabled on multiple websites other than YouTube, based on notices attributed by those websites to UMG. UMG has not denied it sent notices beyond YouTube. Discovery is appropriate to determine the truth, and to correct any remaining wrongful takedowns.

Example 1: A *Huffington Post* article on December 10 linked to the Megaupload Video posted at Vimeo.com. Dotcom Decl., Exh. H. An update at 11:51 P.M. on December 11 reported that "[t]he video has been pulled from Vimeo, making it seem as if UMG has won." *Id.* UMG argues that this is hearsay, speculation, and "there is no actual evidence that UMG ever sent a takedown notice to vimeo.com." Opp. at 5, 6. But nowhere does UMG, which surely knows, state whether it did or not. And, although UMG argues that the video can be found today on Vimeo, it has not been restored to the link at *Huffington Post*, where the video is still down. *See* *http://www.huffingtonpost.com/2011/12/10/megaupload-music-video-ka_n_1140737.html* (last checked 5:20 A.M., December 15, 2011). To determine whether UMG blocked, and failed to remove a block, on this file, requires discovery. If this or any other link is still down from UMG's blocking, its immediate restoration should be ordered by preliminary injunction.

Example 2: UMG calls the dead link at imgur.com/DjNAV "confusing." But UMG submits no evidence denying that it sent a notice to imgur. The website displays the statement: "This video contains content from UMG, who has blocked it on copyright grounds." Dotcom Decl., Exh. I. UMG claims that this might be "an in-line link to a video displayed on YouTube (and subject to a reference file)." Opp. at 14. But this is not the legend that YouTube displays.

*Compare* Dotcom Decl., Exh. F (YouTube legend: "This video is no longer available due to a copyright claim by UMG.") UMG also claims that this might be a still image. Opp. at 14. But even if it were a still extracted from the Megaupload Video, UMG had no ownership interest or right to take the image down. There is no proof that this link has been restored or is now available. Discovery from UMG will tell whether the Court should order the deletion corrected.

Example 3: Although now moot, the situation with YouTube also shows the need for discovery. In an argument utterly lacking legal or factual plausibility,[2] UMG claims that it is immune from remedies under the DMCA because it submitted takedown notices under a "contract" with YouTube rather than under the DMCA. There is no admissible evidence that this occurred. The contract has not been presented,[3] nor a declaration by the person who submitted the notice(s) to YouTube, nor a copy of the actual notice(s) submitted. There is merely a hearsay letter written by counsel after this motion was filed. Klaus Decl., Exh. 4. Moreover, while UMG claims that it obtained extra rights based on "contractually specified criteria" (Opp. at 13) by using YouTube's CMS, rather than an individual takedown notice, YouTube apparently

---

[2] Although the Court need not address the issue here, UMG's argument that it has not made an actionable misrepresentation if it acts under "private" deals to purge files faster is untenable and pernicious. Section 512(f) speaks to any "misrepresentation under this Section" that "material or activity is infringing." That is exactly what happened here: UMG made misrepresentations to YouTube, a host of content indisputably covered by Section 512. Plaintiff has cited no case that limited actionable misrepresentations to those complying with the strictures of Section 512(c)(3)(A), so as to exclude other, "streamlined" notices that do not check every box for every file. Indeed, if "misrepresentations" were so limited, UMG and others could simply negotiate for themselves more lenient standards to evade responsibility for even wanton conduct. UMG's reliance on *River Rock Commc'ns v. Universal Music Grp., Inc.*, 2011 WL 1598916, at *16 (C.D.Cal. Apr. 27, 2011), is misplaced. That case held that a notice directed at purportedly infringing conduct that did not even fall within the scope of the DMCA's safe harbors could not qualify as a notification subject to Section 512(f). *Id.* n.11.

[3] UMG's statement that it submitted notices under the contract is inadmissible hearsay. The vague description of the contract's content is further inadmissible under the Best Evidence Rule. UMG has its contract. Klaus Decl., Exh. 4 (quoting contract sections). "Where the contents of a writing are sought to be proved . . . the Original Writing Rule requires submission of the original document." *In re Mullins*, 125 B.R. 808, 811 (E.D. Cal. 1990) (citing Fed. R. Evid. Rule 1002). Megaupload therefore objects to UMG's discussion of the CMS Agreement (not attached to the Opposition papers, but described as the "UMG-YouTube agreement" at Opp. 13:16 and as the "March 31, 2009 Video License Agreement for UGC Video Service Providers" in Exhibit 4 of the Klaus Declaration).

disagreed. YouTube asserted that "UMG's rights to use the YouTube [CMS]. . . are limited to instances in which UMG asserts a claim that a user-posted video contains material that infringes a UMG copyright." *Id.*[4] Likewise, YouTube's Content Verification Program—which YouTube explains "is only for removal of content that allegedly infringes copyright"—has terms repeatedly stating that a noticing party is subject to penalties under the DMCA for false submissions. *See* www.youtube.com/cvp_app (noting, for owners in the United States, "under Section 512(f) any person who knowingly materially misrepresents that material or activity is infringing may be subject to liability for damages."). Tellingly,YouTube treated UMG's notice like any other DMCA notice, allowing Megaupload to submit a *copyright* counter-notification. Dotcom Decl. ¶ 23, Exh. N.

It is quite possible that UMG, the largest music company in the world, has used similar "private" automated processes to disable files at Vimeo, *Huffington Post*, and many other locations—processes that it may also claim somehow immunizes it from liability under the DMCA. Expedited discovery about the notice contents would establish whether UMG made statements constituting misrepresentations under Section 512(f). Thus, such discovery should proceed forthwith, before hearing on the preliminary injunction, to reveal which additional wrongful notices have been issued, not withdrawn, and remain to be corrected by Court order.

## III. RELIEF IN THE FORM OF A PRELIMINARY INJUNCTION IS AVAILABLE.

UMG's argument that injunctive relief is unavailable in this action misstates the law, and is no obstacle to proceeding with the OSC, for two independent reasons.[5]

### A. Injunctive Relief Is Available for Violations of Section 512(f).

UMG is correct that section 512(f) is silent as to equitable relief. But it is wrong that this

---

[4] We do not know exactly what YouTube asserted, because, although YouTube and UMG "corresponded with each other over the weekend" (Opp. at 4) and continuing through December 14, 2011 (Klaus Decl., Exh. 4), UMG has shown only one of its own letters, which its counsel wrote after Megaupload's TRO application was pending. *Id.*

[5] Megaupload has also complied with Civ. L.R. 7-10, which requires citation of "the statute, rule or order which permits the use of an *ex parte* motion to obtain the relief sought." Megaupload cited Fed. R. Civ. P. 65, which authorizes *ex parte* motions to obtain temporary restraining orders, the relief Megaupload sought.



FENWICK & WEST LLP ATTORNEYS AT LAW MOUNTAIN VIEW

should be construed as a limitation on courts' inherent power to grant an injunction. Federal courts "have inherent equitable jurisdiction in actions properly before them" and thus, subject to certain statutory limits not relevant here, "may issue an injunction in any case within its subject matter jurisdiction in which equitable relief is proper under applicable substantive law." Schwarzer et al., *Federal Civil Procedure Before Trial, Cal. & 9th Cir. ed.* (The Rutter Group 2011) ¶ 13:22 (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–12 (1982)).

It is well-settled that "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) (affirming grant of injunction where statute was silent as to equitable relief); *see also Reebok Int'l v. Marnatech Enters.*, 970 F.2d 552, 561-62 (9th Cir. 1992) (holding that "a strong presumption militates against any such finding" that Congress limited the courts' equitable power); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.")

Megaupload has sought provisional equitable relief, and UMG has failed to present any Congressional command to limit the Court's equitable authority in actions brought under Section 512(f). UMG cites to other sections of the Copyright Act that expressly cabin the availability of injunctive relief, while admitting those sections do not govern this action. That approach falls far short of the "necessary and inescapable inference" required by the Supreme Court's jurisprudence to construe a limit to this Court's equitable power to secure complete justice.

Nor can the availability of counter notices under § 512(g) substitute for a clear statement restricting the Court's equitable jurisdiction. Section 512(g) does not speak to equitable remedies at all; as UMG admits, it is an extrajudicial "incentive" to service providers to restore content where its allegedly infringing nature is disputed. UMG has offered no authority to suggest that the existence of this safe harbor incentive *for third party service providers*, which provides no guarantee of reinstatement for disputed works, negates the remedies available in an action between a party who posts content to the Internet and another party who falsely claims copyright

over that material. *See also* Ex Parte Application [Dkt. No. 5, at 6-7] (explaining limitations on counternotice provisions). If the counter-notice provision in § 512(g) were deemed sufficient to protect users' interests, Congress would have no reason to create a cause of action for misrepresentation at all. *See, e.g., Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1156 (N.D. Cal. 2008) ("The unnecessary removal of non-infringing material causes significant injury to the public where time-sensitive or controversial subjects are involved and the counter-notification remedy does not sufficiently address these harms.")

None of UMG's numerous cites are to the contrary. The majority of them deal with situations in which Congress *did* speak clearly and directly to the availability and scope of equitable relief, by providing express limitations on the nature of equitable relief available or the class of parties entitled to seek it. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 632 F.3d 1111 (9th Cir. 2011) (statute "list[ed] only injunctive relief to the exclusion of other equitable remedies," thus indicating Congressional intent to limit the type of equitable relief available); *Religious Tech. Center. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986) (RICO afforded injunctive relief to governmental plaintiffs while deliberately excluding it from private plaintiffs); *Yeagley v. Wells Fargo & Co.*, 2006 WL 193257 (N.D. Cal. Jan. 23, 2006) (statute granted the FTC and other *government* agencies the power to obtain injunctive relief, but limited the remedies for *private* actions to damages and attorneys' fees). The remainder address whether a private cause of action may be implied where a statute does not expressly create one, not whether a court's traditional equitable remedies are available to statutory causes of action. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19-20 (1979) (finding an implied private right of action for money damages was not available, because the court was chary of reading remedies into the statute); *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) (finding statute did not authorize private actions).[6]

[6] The cases in UMG's footnote involve "carefully-tailored administrative scheme[s]" evincing a clear Congressional intent regarding remedies, and do not address injunctive relief at all. *Williams v. United Airlines, Inc.*, 500 F.3d 1019, 1024 (9th Cir. 2007) (given statute's elaborate enforcement mechanisms, finding no implied private right of action); *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1007-08 (9th Cir. 2010) (no declaratory relief for future liability where Congress specified other mechanism for declaration of liability).

Tellingly, UMG has not identified a single case holding that an injunction is unavailable under Section 512(f), while multiple district courts have recently granted such relief. *See Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452 (S.D.N.Y. 2007); *Amaretto Ranch Breedables v. Ozimals, Inc.*, 2010 WL 5387774 (N.D. Cal. Dec. 21, 2010) (Breyer, J.). Judge Breyer was well aware of the rules governing the existence of remedies. Six years earlier he had found the statute at issue in *Yeagley* to expressly reserve injunctive relief *only* to government agencies, precluding such relief to private litigants. But he had no problem granting a temporary restraining order to remedy violations of Section 512(f) in *Amaretto Ranch*, 2010 WL 5387774. Congress has simply not imposed its "clearest command" against full equitable relief here.

**B. Injunctions Are Also Available Under the Declaratory Judgment Act.**

UMG also ignores that Section 512(f) is not the only claim under which Megaupload has asked for an OSC for injunctive relief. Megaupload has also brought a claim under the Declaratory Judgment Act, 22 U.S.C. § 2201 *et seq.*, seeking a declaration that UMG has no interest in the Megaupload Video, a claim UMG's Opposition effectively concedes. *See* Complaint, ¶ 31-33; *Ex Parte* Application, at 3-4, 8 (Part III), 14:16-17 (arguing substantial likelihood of success on claim for declaratory relief). This provides a second, independent basis upon which Megaupload is entitled to injunctive relief.

Courts are fully empowered to grant injunctive relief under the Declaratory Judgment Act. *Powell v. McCormack*, 395 U.S. 486, 499 (1969) (observing that, under 28 U.S.C. § 2202, "declaratory relief can be [] used as a predicate to further relief, including an injunction"); *Rincon Band of Mission Indians v. Harris*, 618 F. 2d 569, 575 (9th Cir. 1980) (Declaratory Judgment Act "empower[s] the court to grant supplemental relief, including injunctive relief"); *McKann v. Kerner*, 436 F. 2d 1342, 1344 (7th Cir. 1971) (Section 2202 provides courts with authorization to grant injunctive relief after issuing declaratory judgment, to "protect and enforce its judgment"). Courts therefore routinely issue preliminary injunctions premised upon the movant's likelihood of success on a declaratory judgment claim. *See, e.g., Bucciarelli-Tieger v. Victory Records*, 2007 U.S. Dist. LEXIS 39634, *7-8 (N.D. Ill. May 17, 2007) (granting preliminary injunction premised solely on claim for declaratory relief, observing that "numerous courts have issued preliminary

injunctive relief in actions involving claims for declaratory judgment"); *United States v. Alabama*, 2006 U.S. Dist. LEXIS 37888 (M.D. Ala. June 7, 2006).

Because injunctive relief is available, the Court therefore should proceed with the OSC and set a hearing date after appropriate discovery.

## IV. GOOD CAUSE EXISTS FOR EXPEDITED DISCOVERY IN LIGHT OF THE PRELIMINARY INJUNCTIVE RELIEF SOUGHT.

Rules 26(d), 30(a), and 34(b) of the Federal Rules of Civil Procedure authorize the Court to shorten the timing requirements of Rule 26(d) in order to expedite discovery. Courts in the Ninth Circuit apply a flexible "good cause" standard to determine whether expedited discovery is warranted. *See, e.g., Semitool v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 274-75 (N.D. Cal. 2002) (expedited discovery granted on showing of good cause). "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* at 276. Expedited discovery is proper where it may ultimately conserve the resources of the parties and the court by expediting the litigation. *Id.* No showing of irreparable harm is necessary. *Id*.

In particular, expedited discovery is necessary and proper where, as here, a plaintiff seeks development of a full evidentiary record to support a motion for a preliminary injunction. *See e.g.*, *Pod-Ners, LLC v. Northern Feed & Bean*, 204 F.R.D. 675, 676 (D. Colo. 2002) (granting a motion for expedited discovery and requiring defendants to respond within 11 days of service); *Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188, 194 (S.D. N.Y. 1999), *aff'd*, 191 F.3d 208 (2d Cir. 1999), (ordering expedited discovery on preliminary injunction). "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996). Any possible prejudice to UMG would be slight because the order sought would merely accelerate discovery that would ultimately occur.

Here, the nature of the preliminary relief and evidence sought constitutes good cause for expedited, focused discovery. Expedited discovery is appropriate to enable Megaupload to obtain evidence regarding the extent of UMG's attempts to take down the Megaupload Video from

various sites across the Web, the completeness of UMG's acts to restore the accessibility of the Megaupload Video on all those sites, and UMG's reasons that purportedly justify past or potential takedowns of the Megaupload Video or similar videos. Although UMG's brief represents that UMG "will not stop YouTube from restoring access to all URLs for the Video pending the resolution of this litigation," Opp. at 11:9-11, UMG provides no evidence that it refrained from sending notices in its effort to censor the Megaupload Video throughout the Web. The direct evidence, such as the notices or requests themselves—which its Opposition tellingly does not reveal or even attest to—are in UMG's possession. Likewise, although UMG makes the novel argument that private notice systems escape the purview of Section 512(f), UMG, again tellingly, has offered no *evidence* about those systems or their requirements. *See* Opp. at 13:16.

UMG's reliance on the repeated argument that Megaupload does not yet have the direct evidence of UMG's notices or requests (*see, e.g.*, Opp. at 5:28, 6:3-4, 6:16-17, 13:8) highlights the need for expedited discovery to allow Megaupload to bolster its already significant circumstantial evidence, before the Court considers whether to issue the preliminary injunction Megaupload seeks. And Megaupload has no independent, practical way to obtain that evidence quickly except from UMG. Only UMG knows all the services providers to whom it issued takedown requests, since Megaupload would at most only receive notice of takedowns involving files that Megaupload itself uploaded, not the viral uploads by third parties.

Finally, expedited discovery is appropriate to determine the nature of UMG's powers and conduct under its undisclosed CMS agreement with YouTube. That agreement and UMG's conduct under it appear to be continuing to interfere with the display of a video in which UMG has no ownership interest. Its operation should be fully known by the time of the preliminary injunction hearing in order to determine the appropriate relief.

Accordingly, Megaupload respectfully requests that the Court order UMG to produce the following limited but critical document discovery, on an expedited schedule, by January 6, 2011.

1. All communications between UMG and any website or service provider (as the term is used in 17 U.S.C. § 512) regarding any actual or requested takedown,

restoration, or assertions of UMG's purported rights with respect to any video that constitutes or includes the Megaupload Video, in whole or in part.

2. All agreements, terms, or takedown procedures between UMG and any website or service provider (as the term is used in 17 U.S.C. § 512) with whom UMG communicated concerning takedown, restoration, or assertion of UMG's purported rights relating to the Megaupload Video.

3. All documents reflecting or discussing UMG's potential or actual bases for contending that it, or anyone it represents, had an ownership interest in or was entitled to request takedowns of the Megaupload Video.

The first and second requests are important to allow Megaupload to respond to UMG's argument (unsupported by competent evidence) that its notifications are not representations within the scope of Section 512(f). *See* Opp. at 12:11-13. They are also important to show the extent of UMG's takedown requests to various websites, whether those takedowns have been withdrawn, and whether the works have been reinstated. They will also reveal the needed information about UMG's CMS agreement with Google and what additional steps, need to be taken to ensure that the continuing interference with the Megaupload Video cease. The third request is likewise important to determine whether UMG had any good faith belief to support its takedown requests and to allow Megaupload to bolster its evidence supporting the need for a declaratory judgment that UMG has no intellectual property rights over the Megaupload Video.

**CONCLUSION**

For the foregoing reasons, although the principal relief requested by TRO has been conceded, the OSC should nonetheless issue, with an order directing that Megaupload may take expedited discovery on the topics requested above (and reprinted in Exhibit 1), with responses to be provided within shortened time for use in briefing prior to the preliminary injunction hearing.

Dated: December 16, 2011

ROTHKEN LAW FIRM

By: *[/s/ Ira P. Rothken]{.underline}*
Ira P. Rothken

FENWICK & WEST LLP

By: *[/s/ Laurence F. Pulgram]{.underline}*
Laurence F. Pulgram

Attorneys for Plaintiff
MEGAUPLOAD LTD.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW